UNITED STATES PUBLIC INTEREST RESEARCH GROUP, Stephanie E. Crawford, and Charles Fitzgerald, Plaintiffs,

v.

ATLANTIC SALMON OF MAINE, LLC., Defendant.

No. Civ.00–151–B–C.

United States District Court,
D. Maine.

June 17, 2002.

Bruce M. Merrill, Portland, ME, Joshua R. Kratka, David A. Nicholas, Joseph J. Mann, National Environmental Law Center, Boston, MA, Charles C. Caldart, National Environmental Law Center, Seattle, WA, for plaintiffs.

Peter W. Culley, Elizabeth R. Butler, Pierce, Atwood, Portland, ME, for defendant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge having filed with the Court on February 19, 2002, with copies to counsel, her Recommended Decision on Plaintiffs' Motion for Summary Judgment and Defendant's Motion for Summary Judgment (Docket No. 49); and Defendant having filed its objection thereto on March 8, 2002, (Docket No. 50), to which objection Plaintiffs filed their response on March 22, 2002 (Docket No. 51); and this Court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; and this Court having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision, and con-

curring with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, it is **ORDERED** as follows:

(1) Defendant Atlantic Salmon of Maine, LLC's objection is hereby **DENIED**.

(2) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**.

(3) Defendant Atlantic Salmon of Maine, LLC's Motion for Summary Judgment is hereby **DENIED**.

(4) Plaintiff U.S. Public Interest Research Group, LLC's Motion for Summary Judgment on the issue of liability under the Clean Water Act is hereby **GRANTED**.

(5) Declaratory relief is hereby **GRANTED** providing that Defendant Atlantic Salmon of Maine, LLC is required to obtain an MEPDES permit from the State of Maine or an NPDES permit from the Environmental Protection Agency in order to lawfully discharge pollutants into Machias Bay or Pleasant Bay.

(6) The Clerk is to schedule a hearing on the issue of what, if any, civil penalty or injunctive relief is appropriate in this case.

## RECOMMENDED DECISION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRAVCHUK, United States Magistrate Judge.

Plaintiffs, the United States Public Interest Research Group, Stephen Crawford, and Charles FitzGerald (collectively "US-PIRG"), filed a Clean Water Act citizen suit against defendant, Atlantic Salmon of Maine, LLC (ASM), alleging discharges of pollutants in violation of the Act. (Docket

No. 2.) Before me for recommended decision are USPIRG's motion for summary judgment (Docket No. 18) on the issue of ASM's liability for Clean Water Act violations and ASM's motion for summary judgment on all claims. (Docket No. 26.) I recommend that the Court **DENY** ASM's motion for summary judgment and **GRANT** USPIRG's motion for summary judgment on the issue of liability under the Clean Water Act.

### Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter at law." Fed.R.Civ.P. 56(c). A fact is "material" when it has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A "genuine issue" exists when the evidence is "sufficient to support rational resolution of the point in favor of either party." *Id.* To determine whether genuine issues of material fact exist in matters subject to cross-motions for summary judgment, the court must draw all reasonable inferences against granting summary judgment. *Cont'l Grain Co. v. P.R. Mar. Shipping Auth.*, 972 F.2d 426, 429 (1st Cir.1992). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Facts

#### *The Parties*

Defendant, Atlantic Salmon of Maine, LLC ("ASM"), owns and operates five salmon farms known as Stone Island, Lib-by Island, Starboard Island, Cross Island North, and Cross Island. (Pls.' Statement of Material Facts (PSMF) ¶ 1.) These farms are located off the Maine coast in Machias Bay. (Def.'s Statement of Material Facts (DSMF) ¶ 1; PSMF ¶ 12.) ASM's other two salmon farms are called Flint Island and Dyer Island and are located in Pleasant Bay. (PSMF ¶ 1.)

ASM also owns one hundred percent of the stock of both Treat's Island Fisheries and Island Aquaculture. (PSMF ¶¶ 2–3; Def.'s Resp. Pls.' Statement of Material Facts (DRSMF) ¶¶ 2–3.) Treat's Island Fisheries, located in Cobscook Bay, consists of four farms and Island Aquaculture in Blue Hill Bay consists of three farms. (*Id.*) Although an ASM production manager manages these sites (PSMF ¶ 6), it is disputed that ASM is responsible for regulatory compliance. (PSMF ¶ 5; DRSMF ¶ 5.)

Plaintiffs consist of the United States Public Interest Research Group, a national organization dedicated to environmental protection, and two individuals, Stephen Crawford and Charles FitzGerald, members of USPIRG. (PSMF ¶¶ 144–145.) Collectively, the plaintiffs will be referred to as "USPIRG." USPIRG initiated this citizen suit claiming that ASM's salmon farms release pollutants into the water in violation of the Clean Water Act. (Am. Compl. at 1.)

#### *ASM's Fish Farm Operations*

ASM's salmon farms consist of two types of sea cages (also referred to as net pens). (DSMF ¶ 2.) One type consists of walkways and square steel frames. (*Id.*) An inner containment net and an outer predator net hang from the steel frame structure. (*Id.*) The other type of sea cage consists of circular Polar Circles, plastic piping, and the same inner and outer nets hanging from the structure. (*Id.*) Both types of net pens are moored to the sea

floor. (DSMF ¶ 27; DRSMF ¶ 27.) The open mesh of the nets allows the current to pass through the nets. (*Id.*)

ASM grows salmon at its Maine freshwater hatcheries until the fish become smolts (i.e. young salmon that are ready to migrate from fresh water to salt water). (PSMF ¶ 26.) When the fish become smolts, ASM transfers them from a boat into the net pens by pumping, dumping, or netting them. (*Id.* ¶¶ 27–28.) The salmon are grown in the net pens for about eighteen to twenty-four months and are then harvested for market. (*Id.* ¶ 29.) Each of ASM's farms, except the Libby Island site, produces at least 9,090 harvest weight kilograms (approximately 20,000 pounds) of salmon a year. (*Id.* ¶ 97; DRSMF ¶ 97.)

### 1. Copper

The nets that confine the fish, as well as the nets that keep predators away from the fish, are treated with an "antifoulant" called Flexguard II. (PRSMF ¶ 35.) Flexguard II contains copper, which is designed to reduce marine growth that would otherwise "foul" ASM's nets. (*Id.* ¶ 36.) ASM cleans its nets by dropping them to the sea floor and allows them to remain there for up to five months. (*Id.* ¶ 38.) USPIRG claims that copper from the nets is released into the marine environment. (*Id.* ¶ 37.)

### 2. Feed

ASM feeds its salmon a meal containing ground-up fish, primarily herring and anchovetta. (Def.'s Additional Statement of Material Facts in Opp'n to Pls.' Mot. Summ. J. (DASMF) ¶ 2.) The fish meal also contains canthaxanthin and astaxanthin, pharmaceutical manufactured pigments that color the fish's flesh pink. (PSMF ¶ 40.) ASM sprays the feed into the net pens from underwater pipes attached to a barge. (*Id.* ¶ 41–42.) Occasionally, the fish are fed by hand or by "blowers" which blow the feed into the salmon cages. (*Id.* ¶ 42.) During feedings, excess feed falls through the bottom of the net pens or is flushed out by the current. (*Id.* ¶ 84; DASMF ¶ 9.) This excess feed can negatively effect the environment. (PSMF ¶ 85.) Each ASM farm, except the Libby Island site, feeds at least 2,272 kilograms (approximately 5,000 pounds) of food during the calendar month of maximum feeding. (*Id.* ¶ 98; DRSMF ¶ 98.)

### 3. Diseases, Viruses, and Parasites

Salmon in ASM's pens have contracted bacterial kidney disease ("BKD"), funrunculosis, cold water disease (also known as fexibacter) and vibrio, which can kill fish or have sublethal effects. (PSMF ¶ 43–44.) Diseases that have affected ASM's fish are transmitted through the water, through fish-to-fish contact. (*Id.* ¶ 50.)

Additional concerns at ASM's farms are viruses and parasites, such as trematode (a type of worm) and sea lice. (*Id.* ¶ 61, 62, 67.) USPIRG claims that fish at an ASM farm have been infected with a viral disease called infectious salmon anemia ("ISA"). (*Id.* ¶ 48.) USPIRG asserts that there is no cure for ISA and it is a significant threat to the remaining endangered wild salmon. (*Id.* ¶ 49.)

### 4. Chemicals and Fish Wastes

ASM treats bacterial infections by mixing the antibiotic oxytetracycline (also known as Terramycin) into the salmon feed. (*Id.* ¶¶ 54, 55, 57.) This feed, like the unmedicated feed, can fall through the bottom of the net pens or be flushed out of the nets into the water by the current. (*Id.* ¶¶ 60, 84; DRSMF ¶¶ 60, 84.)

In order to treat sea lice, ASM uses cypermethrin, a toxic chemical. (PSMF ¶ 68.) The cypermethrin is contained in a product called Excis, which the FDA has not yet approved. (*Id.* ¶ 72.) Excis con-

tains one percent cypermethrin and is used by ASM as an Investigational New Animal Drug ("INAD"). (*Id.* ¶ 73; DRSM ¶ 13.) Although, the designation of cypermethrin as an INAD has expired, ASM wants to continue to use this toxic chemical to control sea lice in its pens. (PSMF ¶ 74.) ASM applies cypermethrin after placing a tarp around a net pen and raising the tarp to confine the salmon in a small area. (*Id.* ¶ 69.) The cypermethrin is then poured from a container into the tarped net pen. (*Id.*) Following the treatment, the tarp is removed and the cypermethrin is released from the net pens into the marine environment. (*Id.* ¶ 70.) In 1995, ASM administered Excis once at one farm site; in 1996, ASM used it once at one farm site; in 1997, it was applied once at three farm sites; in 1998, it was used three times at one farm site, twice at two farm sites, and once at another farm site. (DASMF ¶ 14.) During 1999, Excis was used once at two sites and in 2000, Excis was used once at one farm site. (*Id.*)

ASM uses two other chemicals which it releases in the bays. When ASM counts the sea lice on its fish, it anesthetizes the fish with a chemical called Finquel that ASM puts into the water. (PSMF ¶ 65– 66.) ASM also puts Parasite–S, a parasite treatment, into the water. (*Id.* ¶ 75.)

Aside from these chemicals, salmon feces and urine fall through the bottom of the net pens or are flushed out by the current and enter the bay water. (*Id.* ¶ 84.) Salmon feces, urine, or other fish wastes exit the net pens at each ASM farm, except the Libby Island site, at least thirty days a year. (*Id.* ¶ 96.)

### 5. Escapees

Fish can escape through holes in ASM's nets which can be created by wear, chaffing, storms, seals, boats, ice, floating logs, feed pipes, and feed barges. (*Id.* ¶¶ 78– 80.) Fish are also able to escape when the sea cages are submerged due to severe icing. (Pls.' Statement of Material Facts Sealed [1] (PSMFS) ¶ 4.) On a few occasions, ASM has discovered holes in its net pens. (PSMFS ¶¶ 1–3; Def.'s Resp. to Pls.' Statement of Material Facts Sealed (DRSMFS) ¶¶ 1–3.) In December 2000, approximately 100,000 fish escaped from ASM's Stone Island farm during a storm. (PSMF ¶ 76.) These fish were Landcatch– St. John hybrids, Landcatch–Penobscot hybrids, and St–John–Penobscot hybrids. (*Id.* ¶ 77.)

ASM's salmon are different from the salmon that naturally exist in Machias Bay and Pleasant Bay. First, some of ASM's salmon are of non-North American origin. (*Id.* ¶¶ 18, 20.) Second, ASM's farm raised salmon can have shortened and eroded fins, a plumper body, and a smaller head to body ratio than non-farmed salmon. (*Id.* ¶ 24.)

### EPA Involvement

In a July 18, 1989 letter from the Director of EPA Region One Water Management Division to William Lawless, Chief Regulatory Branch, Army Corps of Engineers, the Director, in commenting on proposed floating aquatic animal production facilities in a bay, stated that "[u]pon reevaluating the regulations, we have determined that some of these concentrated aquatic animal production facilities may require a permit under the National Pollutant Discharge Elimination System (NPDES) program." (DSMF ¶ 4, Culley Decl. I Ex. 3.) The following month, August 1989, the EPA responded by letter to a parties' notice of intent to sue the EPA for failing to require salmon net pen facilities in Maine to have NPDES permits. (DSMF ¶ 5, Culley Decl. I Ex. 4.) In the letter, the EPA stated that upon its review

---

**1.** ASM waived its claim of confidentiality regarding the exhibits included in Plaintiffs' Statement of Material Facts Sealed. *See* Docket No. 46.

of the Clean Water Act and the applicable regulations, it concluded that salmon net pen facilities in Maine may constitute "Concentrated Aquatic Animal Production Facilities" under 40 C.F.R. § 122.24(b) and Appendix C or under § 122.24(c). (*Id.*) The EPA noted that the Maine salmon net pen facilities would be required to submit information to enable the EPA to take appropriate action. (*Id.*) However, over a year passed without any EPA action to require information from the salmon aquaculture sector in Maine. (*Id.* ¶ 8.)

In October 1990, EPA Region One sent ASM a letter stating that its facilities are required to obtain National Pollutant Discharge Elimination System ("NPDES") permits and instructed ASM to submit an NPDES application. (*Id.* ¶ 9.) ASM submitted its application for an NPDES permit in October 1990, for its Cross Island sites. (*Id.* ¶¶ 10, 18.) In January 1992, ASM submitted an NPDES application for its Starboard Island site and has since submitted NPDES applications for each of its successive sites.[2] (*Id.* ¶ 18, 20.) However, ASM never received any permits or any response from the EPA regarding any of its NPDES applications. (*Id.* ¶ 11.)

In 1993, ASM wrote to the EPA and asked for a "letter of assurance" that the farms could operate without an NPDES permit. (PSMF ¶ 91; DRSMF ¶ 30.) The EPA did not respond to ASM's request. (DRSMF ¶ 30.) During these years, the EPA was the only NPDES permitting agency, as delegation to the State of Maine did not occur until January 2001. (DSMF ¶ 21.) Although ASM submitted NPDES permit applications to the EPA for its net pen sites at Cross Island North, Dyer

Island, Starboard Island, Libby Island, and Flint Island (Pls.' Resp. to Def.'s Statement of Material Facts (PRSMF) ¶ 27), ASM has not obtained an NPDES permit for any of its Maine salmon farms. (PSMF ¶ 90; DRSMF ¶¶ 26, 30.) The EPA has not contacted ASM to conduct a site inspection nor conducted such inspection. (DSMF ¶ 21.)

## Discussion

In its citizen suit under the Clean Water Act, USPIRG seeks a declaratory judgment that ASM has violated, and is violating, the Clean Water Act and an injunction ordering ASM to cease operations at its Maine salmon farms. (Am. Compl. at 9.) Further, USPIRG seeks civil penalties for Clean Water Act violations from April 26, 1995, to date and reasonable attorney's fees and costs. (*Id.*) USPIRG filed a motion for summary judgment requesting the court to grant their claim for declaratory relief by finding that ASM's salmon farms violate the Clean Water Act, 33 U.S.C. § 1311, as the farms discharge pollutants without a National Pollution Discharge Elimination System ("NPDES") permit. (Pls.' Mot. Summ. J. (PMSJ) at 2.) ASM filed a cross motion for summary judgment on the grounds that it is not required to obtain an NPDES permit and that it is not prohibited under the Clean Water Act from discharging pollutants. (Def.'s Mot. Summ. J. (DMSJ) at 2–3.)

### A. *Is There a Violation of the Clean Water Act?*

The Clean Water Act ("Act") states that "the discharge of any pollutant by any person is unlawful." 33 U.S.C. § 1311(a). When a person or entity is in compliance

---

2. The EPA has not issued a "general" NPDES permit to cover the salmon farming industry in Maine, thus ASM would have applied for "individual" permits. A "general" NPDES permit is generally applicable to a group of point sources consisting of similar operations and similar types of waste discharges. *Texas*

*Oil & Gas Ass'n v. U.S. EPA.*, 161 F.3d 923, 929 (5th Cir.1998) (citing 40 C.F.R. 122.28). An "individual" permit applies to individual point source dischargers. *Driscoll v. Adams*, 181 F.3d 1285, 1288 (11th Cir.1999). When an NPDES permit is required, either type of permit suffices as compliance with the Act.

with certain provisions of the Act, they are exempt from the prohibition in § 1311(a). *Id.* Here, the only relevant exemption is section 1342, which authorizes the Environmental Protection Agency Administrator ("EPA") to issue NPDES permits allowing individuals or entities to discharge pollutants, thereby exempting them from the prohibition in § 1311(a). *See* 33 U.S.C. § 1342(a)(1) & (k). Sections 1311(a) and 1342 are understood to mean that the discharge of a pollutant is prohibited unless an NPDES permit has been obtained. *See, e.g., EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205, n. 14, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 489, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) ("Section 301(a) of the Act, 33 U.S.C. § 1311(a), generally prohibits the discharge of any effluent into a navigable body of water unless the point source has obtained an NPDES permit...."). A permit may be granted from the EPA or from the state where the discharger is located, if the state has developed a program and has received permitting authority from the EPA. *See* 33 U.S.C. § 1342(a), (b).

■ The phrase "discharge of a pollutant" found in § 1311(a) is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Thus, a "discharge of a pollutant" occurs when five elements exist: "(1) a pollutant must be (2) added (3) to navigable waters (4) from (5) a point source."

*Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C.Cir.1982). USPIRG has the burden of demonstrating that each element exists in order to establish that ASM is "discharging a pollutant" as defined by the Act.

### 1. Elements (1) and (2): A Pollutant Must be Added

Under § 1362(6) of the Act, the term "pollutant"

means dredged spoil, *solid waste,* incinerator residue, sewage, garbage, sewage sludge, munitions, *chemical wastes, biological materials,* radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and *industrial, municipal, and agricultural waste* discharged into water.

33 U.S.C. § 1362(6) (emphasis added).

■ Courts have interpreted the definition of pollutant "to encompass substances not specifically enumerated but subsumed under the broad generic terms" listed in § 1362(6). *See, e.g., Hudson River Fishermen's Ass'n v. City of N.Y.*, 751 F.Supp. 1088, 1101 (D.N.Y.1990), *aff'd,* 940 F.2d 649 (2nd Cir.1991)(citing *United States v. Hamel,* 551 F.2d 107 (6th Cir.1977)). It is not relevant that the EPA has not issued a permit or promulgated an effluent limitation to regulate the substance alleged to be a pollutant; the court can independently determine that a substance falls within one of the general terms of § 1362(6).[3] *Sierra Club, Lone Star Chapter v. Cedar Point*

---

**3.** Although USPIRG introduces into the record numerous facts relating to the harm certain substances may have on the environment or to humans, the Act does not require proof that the pollutant causes harm. *See Long Island Soundkeeper Fund, Inc. v. N.Y. Athletic Club,* 1996 WL 131863, *15 (D.N.Y.1996) (citing *City of Milwaukee v. Ill.,* 451 U.S. 304, 310, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981); *Orange Env't, Inc. v. County of Orange,* 811 F.Supp. 926, 934 (D.N.Y.1993)). In citizen suits such as this (where an action is brought

against a defendant for discharging an alleged pollutant without a permit) a court's role is only to "apply the statutory definition [of § 1362(6)] to determine if the substance in question is a pollutant." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 567 (5th Cir.1996) (also stating that the determination of whether a substance is a pollutant does not require "a 'complex balancing' of biological, technical, and economic factors, such as the EPA must undertake when promulgating effluent standards.").

*Oil Co.,* 73 F.3d 546, 566–568 (5th Cir. 1996), *cert. denied,* 519 U.S. 811, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996) (stating that the definition of pollutant is meant to "leave out very little" and discussing the courts' ability in citizen suits to determine whether a particular substance falls within the definition of "pollutant" and citing cases). *See also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 309, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("the release of ordnance from aircraft or from ships into navigable waters is a discharge of pollutants, even though the EPA, which administers the Act, had not promulgated any regulations setting effluent levels or providing for the issuance of an NPDES permit for this category of pollutants.").

USPIRG alleges that ASM's fish farms release pollutants such as salmon, salmon feces, salmon urine, fish feed, cypermethrin, copper, pathogens, parasites, and antibiotics.[4] (Am. Compl. at 5–6.) USPIRG argues that these substances fall under the Act's definition of "pollutants" because they are solid waste, chemical wastes, biological materials, or agricultural waste. (PMSJ at 14–15.)

 The record supports USPIRG's claim that ASM puts various substances into the water at its net pens and these substances flow out of ASM's net pens and into either Machias Bay or Pleasant Bay. First, it is undisputed that ASM grows salmon of non-North American origin in its net pens (PSMF ¶¶ 18–20; DRSMF ¶¶ 18–20) and that some of these salmon escape from the pens into the bay. (PSMF ¶¶ 78–80; DRSMF ¶¶ 78–80; PSMFS ¶¶ 1–4; DRSMFS ¶¶ 1–4.) Fish that do not naturally occur in the water, such as non-North American salmon, fall within the term "biological material" and are therefore pollutants under the Act. *See Nat'l Wildlife Fed'n v. Consumers Power Co.,* 862 F.2d 580, 583, 586 (6th Cir.1988) (finding that "... live fish, dead fish and fish remains annually discharged into Lake Michigan by the... facility are pollutants within the meaning of the CWA, since they are 'biological materials,'" but holding that because the fish were not "added," a permit was not required) (citing *Ass'n of Pacific Fisheries v. EPA,* 615 F.2d 794 (9th Cir. 1980)). Second, the salmon feces and urine that exit the net pens and enter the waters (PSMF ¶ 84) are pollutants as they constitute "biological materials" or "agricultural wastes." *See Higbee v. Starr,* 598 F.Supp. 323, 330–331 (D.Ark.1984), *aff'd,* 782 F.2d 1048 (8th Cir.1985) (finding that the hog farm is a concentrated animal feeding operation and finding the hog waste that fell directly from the animals through slats in the floor into holding ba-

---

4. USPIRG also argues, and ASM admits, that until "late" 2000, ASM released blood water (i.e. the mixture of carbon dioxide bath water and salmon blood that remains after bleeding the fish) into navigable waters. (PMSJ at 5; PSMF ¶¶ 30–32; DRSMF ¶¶ 30–32.) Blood water falls under the category of "biological material" and thus qualifies as a pollutant under the Clean Water Act. ASM's blood water discharges continued after the July 31, 2000 filing of their citizen suit, thus USPIRG may have a valid claim for civil penalties up to the date in 2000 when ASM terminated this practice and began using its processing plant's wastewater treatment system. (Pls.' Reply to Def.'s Resp. to Mot. Summ. J. (PRRSMJ) at 1, n. 1; PSMF ¶ 34; DRSMF ¶ 34.). However, unlike the other alleged discharges of pollutants, USPIRG does not claim that ASM's blood water discharges are conveyances at a CAAPF (i.e. net pen point sources). Instead, USPIRG states that the blood water discharges occurred in "the ocean somewhere between the processing plant and the pens." (PSMF ¶ 32.) The dumping of blood water is a separate source of pollutants at the facility that are a product of fish processing, an activity unrelated to aquatic animal production. Given that the parties have not briefed the issue of discharges in that water beyond the net pen farms, the blood water discharges will not be considered here.

sins is "agricultural waste" under the Clean Water Act, but holding that there was no evidence that a "discharge" to navigable waters occurred).

▆ Third, ASM blows, sprays or otherwise distributes salmon feed into the net pens. (PSMF ¶¶ 41–42.) This feed contains ground-up fish, canthaxanthin and astaxanthin, which are pigments used to color the fish's flesh pink, and sometimes contains an antibiotic called oxytetracycline. (PSMF ¶¶ 40, 55, 57; DRSMF ¶¶ 40, 55, 57.) Excess or uneaten feed enters the water when it flows out of the pens or falls through the net pens to the ocean floor. (PSMF ¶ 60; DRSMF ¶ 60.) It is not clear whether the fish parts contained in the feed, which would fall under the category of "biological materials" or "solid waste," come from either Machias Bay or Pleasant Bay, thus a determination cannot be made here as to whether the ground-up fish feed would constitute an "addition" to the waters. Nonetheless, ASM mixes into the feed pharmaceutical manufactured canthaxanthin and astaxanthin, and an antibiotic called oxytetracycline. These uneaten chemicals flow from the pens and become waste. As such, they are subsumed in the category of "chemical wastes" and are therefore pollutants. *See United States v. Schallom*, 998 F.2d 196, 199 (4th Cir.1993), *cert. denied*, 510 U.S. 902, 114 S.Ct. 277, 126 L.Ed.2d 228 (1993) (finding that shotcrete, which is "composed of materials specifically identified as pollutants, including chemicals," and that cement, which is a mixture of chemicals and materials, fall under the category of "chemical wastes").

▆ Fourth, after treating its salmon for sea lice, ASM releases the tarp holding the salmon and thereby releases cypermethrin through the net pens into the water. (PSMF ¶¶ 68–69; DRSMF ¶¶ 68–69.) ASM also uses chemicals Finquel and Parasite–S which it releases into the bay. (PSMF ¶¶ 65–66, 75; DRSMF ¶¶ 65–66, 75.) These three chemicals released into the water after their use fall within the category of "chemical wastes" and are also pollutants. Fifth, copper from the net pens at ASM's farms enters the water.[5] (PSMF ¶ 37.) Copper is specifically listed by the EPA as a "toxic pollutant" in 40 C.F.R. § 401.15(22), thus copper is a pollutant under the Act. *See Cedar Point Oil Co.*, 73 F.3d at 568–569 (finding produced water to be a pollutant under the Act in part because components of produced water were included in 40 C.F.R. § 401.15, the EPA's "toxic pollutants" regulation (citing *Dague v. Burlington*, 732 F.Supp. 458, 469–70 (D.Vt.1989) ("finding substances discharged by defendants to be pollutants by reference to the toxic pollutant list.")))).

Based on the undisputed facts and the broad reading of the term "pollutant," the escaping non-North American origin salmon; the copper; the chemicals cypermethrin, Finquel, and Parasite–S; and the feed containing chemicals and antibiotics, all fall within the definition of "pollutants" under the Act. Moreover, as these items are put in the water by ASM as a part of its operation, they do not naturally occur in the bay and therefore are "additions" to the water.[6] *See, e.g., Catskill Mountains*

---

**5.** USPIRG's complaint and motion focus on the argument that the point source is ASM's facilities, not the nets in and of themselves (the distinction will become clear in the discussion below regarding whether ASM's net pen fish farms constitute "concentrated aquatic animal production facilities" and are therefore point sources). The nets are treated

with copper, ASM physically introduces the copper-coated nets into the water, and the copper is released from the nets into the waters. Thus, copper is added from the outside world into the waters at ASM's facilities.

**6.** USPIRG claims ASM's net pens also release parasites, pathogens, and disease. It is suffi-

*Chapter of Trout Unlimited v. City of N.Y.*, 273 F.3d 481, 491 (2nd Cir.2001) ("The EPA's position, upheld by the *Gorsuch* and *Consumers Power* courts, is that for there to be an 'addition,' a 'point source must introduce the pollutant into navigable water from the *outside world*.'" (citing *Gorsuch*, 693 F.2d at 165 and *Consumers Power Co.*, 862 F.2d at 586) (emphasis added)).

### 2. Element (3): Navigable Waters

The Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). ASM's Maine sea farms are located in Machias Bay and Pleasant Bay (PSMF ¶ 1; DRSMF ¶ 1), thus they are clearly within the definition of "navigable waters."

### 3. Elements (4) and (5): From a Point Source

■ ASM does not dispute that the alleged discharges come "from" its farms (PSMF ¶¶ 60, 65–66, 70, 75, 78, 84; DRSMF ¶¶ 60, 65–66, 70, 75, 78, 84), but does dispute the final element, whether ASM's net pen operations constitute a "point source."

When the Clean Water Act was drafted, the focus was placed on point sources presumably because they were easy to identify and regulate compared to nonpoint sources. *Natural Res. Def. Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir.1990). The classification as a point source is crucial as the Act only prohibits discharges from a point source.[7] *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 371

(10th Cir.1979). The EPA was given the power to define point sources and nonpoint sources. *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1382 (D.C.Cir. 1977). In exercising that power, the EPA determined that fish farms which are "aquatic animal production facilities" ("AAPFs") are nonpoint sources. 44 Fed. Reg. 32,854, 32,870 (June 7, 1979). As nonpoint sources, they are not prohibited by § 1311(a) from discharging pollutants and are not required to have an NPDES permit. The EPA also determined that AAPFs that fall within the definition of "concentrated aquatic animal production facilities" ("CAAPFs") found in 40 C.F.R. Appendix C of Part 122, are point sources. 40 C.F.R. § 122.24(b). Appendix C, titled "Criteria for Determining a Concentrated Aquatic Animal Production Facility," states:

> A hatchery, fish farm, or other facility is a concentrated aquatic animal production facility for purposes of § 122.24 if it contains, grows, or holds aquatic animals in either of the following categories:
>
> (a) Cold water fish species or other cold water aquatic animals in ponds, raceways, or other similar structures which discharge at least 30 days per year but does not include:
>
> (1) Facilities which produce less than 9,090 harvest weight kilograms (approximately 20,000 pounds) of aquatic animals per year; and
>
> (2) Facilities which feed less than 2,272 kilograms (approximately 5,000 pounds) of food during the calendar month of maximum feeding.

cient to find ASM liable for Clean Water Act violations for adding pollutants such as non-native fish and chemicals, therefore I need not determine whether these other items are "pollutants" that are "added" to the water.

**7.** Nonpoint sources can be regulated by states. *Oregon Natural Res. Council v. U.S.*

*Forest Service*, 834 F.2d 842, 849 (9th Cir. 1987) ("Congress addressed nonpoint sources of pollution in a separate portion of the Act which encourages states to develop areawide waste treatment management plans." (citing 33 U.S.C. § 1288)).

(b) Warm water fish species or other warm water aquatic animals in ponds, raceways, or other similar structures which discharge at least 30 days per year, but does not include:

(1) Closed ponds which discharge only during periods of excess runoff; or

(2) Facilities which produce less than 45,454 harvest weight kilograms (approximately 100,000 pounds) of aquatic animals per year.

"Cold water aquatic animals" include, but are not limited to, the Salmonidae family of fish; e.g., trout and salmon. "Warm water aquatic animals" include, but are not limited to, the Ameiuride, Centrarchidae and Cyprinidae families of fish; e.g., respectively, catfish, sunfish and minnows.

40 C.F.R. Pt. 122, App. C.

The EPA promulgated its determination that CAAPFs are point sources in a 1979 regulation, 40 C.F.R. § 122.24, which in part states:

(a) Permit requirement. Concentrated aquatic animal production facilities, as defined in this section, are point sources subject to the NPDES permit program.

(b) Definition. "Concentrated aquatic animal production facility" means a hatchery, fish farm, or other facility which meets the criteria in Appendix C of this part, or which the Director designates under paragraph (c) of this section.

40 C.F.R. § 122.24

As subsection (b) mentions, AAPFs that do not fall within the Appendix C definition of a CAAPF, do not have a free pass to discharge pollutants. The EPA recognizes "that some [AAPFs] that may not be classified as concentrated under the formula [in Appendix C], nevertheless, may be significant contributors of pollution."

44 Fed.Reg. 32,854, 32,870 (June 7, 1979). Thus, under subsection (c) of § 122.24, the EPA has the discretion, on a case-by-case basis to "designate any warm or cold water aquatic animal production facility as a concentrated aquatic animal production facility upon determining that it is a significant contributor of pollution to waters of the United States." 40 C.F.R. § 122.24(c). This is established in the remainder of § 122.24:

(c) Case-by-case designation of concentrated aquatic animal production facilities.

(1) The Director may designate any warm or cold water aquatic animal production facility as a concentrated aquatic animal production facility upon determining that it is a significant contributor of pollution to waters of the United States. In making this designation the Director shall consider the following factors:

(i) The location and quality of the receiving waters of the United States;

(ii) The holding, feeding, and production capacities of the facility;

(iii) The quantity and nature of the pollutants reaching waters of the United States; and

(iv) Other relevant factors.

(2) A permit application shall not be required from a concentrated aquatic animal production facility designated under this paragraph until the Director has conducted on-site inspection of the facility and has determined that the facility should and could be regulated under the permit program.

40 C.F.R. § 122.24

"In designating an operation or facility as a significant contributor of pollutants, the Director essentially finds that the facility's discharges are more like point sources already subject to NPDES regulation than agricultural nonpoint sources that are not." 65 Fed.Reg. 43,586, 43,648 (July 13, 2000).

When an AAPF is designated as a CAAPF under subsection (c), the facility is not required to have a permit until after the EPA has conducted a site visit and made a determination that the site should and could be regulated under the NPDES program. 40 C.F.R. § 122.24(c)(2).

USPIRG and ASM agree that the EPA has not designated ASM's farms as CAAPFs under the discretionary provision of subsection (c). (DMSJ at 10; PRMSJ at 3.) USPIRG claims, and ASM disputes, that ASM's farms are CAAPFs under Appendix C and are therefore required to have a permit. ASM raises two intertwined arguments as to why their farms do not involve "ponds, raceways, or other similar structures" and thus are not regulated under Appendix C.[8] First, ASM argues that their offshore net pen operations do not fall within the phrase "ponds, race-

ways, or other similar structures" because the phrase focuses on "land-based" structures. (DMSJ at 8.) Second, ASM asserts that net pen operations do not involve a "discrete, confined and direct conveyance" (*Id.* at 3) or specifically "discrete discharge pipes" and therefore "are not point sources subject to NPDES permitting." (*Id.* at 8.)

 In respect to ASM's first argument, ASM's conclusion that the Appendix C phrase "ponds, raceways, and similar structures" excludes its net pen operations due to their offshore location is contrary to EPA statements that ASM's net pens may fall within Appendix C. At least two communications from the EPA indicate that the EPA does not view the Appendix C phrase "ponds, raceways, or other similar structures"[9] as barring the application of Appendix C to offshore net pen sea farms.[10] First, in an August 1989 letter

8. ASM's underlying theory is that its net pen operations are CAAPFs that are *not* regulated. (DMSJ at 3, 11.) Not having been designated a CAAPF under subsection (c) and not falling within the definition in Appendix C, ASM asserts that its farms *are CAAPFs* which are *not* regulated. (*Id.* at 7, 10–11.) However, this theory contradicts the definition of a CAAPF in § 122.24 which states that a CAAPF is a "hatchery, fish farm, or other facility *which meets the criteria in Appendix C* of this part, *or which the Director designates* under paragraph (c) of this section." 40 C.F.R. § 122.24(b) (emphasis added). Thus, a facility cannot be a CAAPF without either falling under the Appendix C definition or being designated by the EPA as a CAAPF. Moreover, ASM's interpretation of § 122.24 is inconsistent with the EPA's statements regarding the regulation of CAAPFs. The EPA has clearly stated that *all* CAAPFs require an NPDES permit. 65 Fed.Reg. 43,586 43,648–649 (July 13, 2000) (stating that "[u]nder existing regulation, concentrated aquatic animal production facilities are subject to the NPDES program" and stating that an AAPF is "subject to regulation under the NPDES permitting program only if the facility is 'concentrated' according to the NPDES regulations."). ASM's assertion that its farms are CAAPFs

that are not regulated is further undermined by the fact that the EPA in 1990 informed ASM that its farms require an NPDES permit. (PSMF ¶ 9; DRSMF ¶ 9.)

9. There are no cases interpreting the Appendix C phrase "ponds, raceways or other similar structures." In addition, neither the proposed rule nor the final rule for the promulgation of § 122.24 provides insight as to the scope of phrase. A traditional "raceway" is an enclosed channel with relatively high rates of moving or flowing water. *See* Michael P. Masser and Andrew Lazur, *In–Pond Raceways*, Southern Regional Aquaculture Center (SRAC), Publication No. 170 (August 1997), *available at http:// www.msstate.edu/dept/srac/fslist.htm*. USPIRG and ASM debate when net pen culture techniques came into existence in order to prove whether the Appendix C phrase includes such operations. (DMSJ at 11; PRMSJ at 6–7, n. 4.) However, establishing the time frame in which net pen facilities were first used is not dispositive to the crux of the matter here, which is whether net pens are structures similar to ponds or raceways.

10. This case involves the meaning of terms in an agency regulation and does not involve

responding to a party's notice of intent to sue the EPA, EPA Region One stated that it reviewed the provisions of the Act and applicable regulations and concluded that salmon *net pen sea farms* may constitute CAAPFs under 40 C.F.R. § 122.24(b) (i.e. Appendix C) *or* (c). (DSMF ¶ 5, Culley Decl. I Ex. 4.) The EPA further stated that it planned to inform "facilities *operating in waters off the coast* of Maine" that they must obtain NPDES permits if they meet the criteria in § 122.24. (Culley Decl. I Ex. 4.)(emphasis added). This communication strongly suggests that the EPA interprets Appendix C as pertaining to net pen sea farms located off the coast of Maine. In a second letter, written in 1990, the EPA informed ASM that pursuant to the Clean Water Act, 33 U.S.C. Part 1251 *et seq,* its facilities are required to obtain NPDES permits for the discharge of pollutants into the waters of the United States. (DSMF ¶ 9, Culley Decl. I Ex. 7.) In reaching the conclusion that ASM's operations required NPDES permits, the EPA must have first classified ASM's facilities as CAAPFs. In order to determine that an AAPF constitutes a CAAPF under the discretionary provision of § 122.24(c), the

EPA must first conduct an on-site inspection of the facility and consider the factors listed in subsection (c). *See* 65 Fed.Reg. 43586, 73649 (July 13, 2000). It is undisputed that the EPA had not conducted a site visit as required under § 122.24 (DSMF ¶ 21; DMSJ at 10: Pls.' Resp. to Def.'s Mot. Summ. J. (PRMSJ) at 3), and that the EPA has never exercised its discretion to deem ASM's farms as CAAPFs under subsection (c). (DMSJ at 10.) Thus, ASM's farms are *not* considered CAAPFs by the EPA under subsection (c). The EPA therefore must have determined that ASM's farms are subject to the NPDES requirement because they fall within the definition of a CAAPF under Appendix C. Both communications clearly demonstrate that the EPA interprets the Appendix C phrase "ponds, raceways, or similar structures" as encompassing net pen sea farms.[11]

I find no support for ASM's contention that the phrase "ponds, raceways, or other similar structures" excludes offshore sea cages because they are not land-based. There is no indication in the proposed rule or the final rule for § 122.24 that suggests

---

statutory construction. Generally, unless plainly erroneous or inconsistent, an agency's interpretation of an ambiguous term in its own regulations is entitled to deference. *See, e.g., Am. Express v. United States,* 262 F.3d 1376, 1382 (Fed.Cir.2001) (citing *Auer v. Robbins,* 519 U.S. 452, 461–462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). Even without these EPA communications, I would reach the conclusion that offshore net pens fall within the scope of the Appendix C phrase "ponds, raceways, and other similar structures."

**11.** In a June 23, 2000 letter by EPA, Region One to plaintiffs' counsel in response to plaintiffs' notice of intent to file a lawsuit against ASM, Connors Aquaculture, and Stolt Sea Farm, the EPA states "The EPA shares your concerns regarding the environmental issues raised in your notice. Under 40 C.F.R.

§ 122.24 and Appendix C to Part 122, *salmon farms are concentrated aquatic animal production facilities* (CAAPFs), and thus are point sources under the Act." (PRSMF ¶ 30; Nicholas Decl. I Ex. 22 at 1.) (emphasis added.) The EPA acknowledges ASM's submission of NPDES applications and explains that *due to resource constraints* the EPA did not issue the permits at that time because they were considered low-priority permits as the "environmental issues related to fish farms in Maine... were not well understood." (*Id.*) ASM objects to this letter as unauthenticated and hearsay, therefore the communication is not included in reaching my conclusion that ASM's net pen operations constitute CAAPFs and thus require an NPDES permit. I call attention to the letter because it reaches a legal conclusion that is the same conclusion I have reached: that these net pen farms located in the bays are deemed CAAPFs under Appendix C.

that the EPA was intending to narrowly focus on land-based fish farms. *See* 43 Fed.Reg. 37,078, 37,082 & 37,100 (Aug. 21, 1978); 44 Fed.Reg. 32,854, 32,870 (June 7, 1979). The goal of the Clean Water Act is to restore and maintain the integrity of the nation's waters. 33 U.S.C. § 1251(a). Requiring fish farms in ponds or raceways to obtain an NPDES permit based on their terrestrial location, while allowing other facilities located in a bay to discharge directly into the water without a permit would be counter to the purposes of the Act. The goals of the Act, the EPA's interpretation that Appendix C is applicable to net pen sea farms, and the lack of judicial support to indicate otherwise, support the conclusion that a sea cage in a predominately enclosed bay can constitute a "similar structure" and therefore fall within Appendix C. ASM offers no evidence or caselaw that would compel an alternative conclusion.[12]

ASM claims in its second argument that it does not fall within the phrase "ponds, raceways, or other similar structures" because net pen operations do not involve a "discrete, confined and direct conveyance" (DMSJ at 3) or specifically "discrete discharge pipes" and therefore "are not point sources subject to NPDES permitting." (*Id.* at 8.) This argument fails because it is contrary to the Act's definition of a point source and twenty years of caselaw. In differentiating itself from the Appendix C "ponds, raceways, or other similar structures," ASM argues,

> In the context of defining a point source, the key characteristic of ponds and raceways is their land-based location and their need to collect and direct the flow of discharge water in a discrete concentrated point source pipe discharge based on their construction and design. Net pens do not share that characteristic because they are not self-contained, solid facilities that require the operator to gather water and funnel it through a pipe to a specific, confined outfall. Rather, because they are free floating in the ocean, the water flows through the nets driven by tides, currents, and other natural factors.

(DMSJ at 9.)

Essentially, ASM takes the position that the phrase "ponds, raceways, or other similar structures" refers to a "narrow category of land-based structures with discrete discharging pipes." (*Id.* at 8.) ASM defines "pond" as "a body of standing water smaller than a lake, often artificially formed," however ASM does not explain how a pond would fall into its interpretation of "structures with discrete discharg-

---

12. One section of the 1990 NPDES application requires the applicant to indicate in one of three boxes the total number of ponds, raceways, and other similar structures in the facility. (Def.'s Reply to Pls.' Resp. Mot. Summ. J. (DRRMSJ) at 5, Nicholas Decl. I Ex. 17 at 3.) Interestingly, the instructions for this section state:

> Give the total number of ponds or raceways in your facility. Under [the box marked] "other," give a descriptive name of *any* structure which is not a pond or raceway *but which results in discharge to waters of the United States.*

(*Id.* Ex. 17 at 4.)(emphasis added.)

This language further demonstrates that the Appendix C definition does not narrowly focus on "land based" facilities that operate with "discharging pipes," but rather focuses broadly on any structure that results in the discharge of pollutants into the waters. ASM's facility consists of net pens, or sea cages as they are sometimes referred, that consist of huge nets suspended from square or round floating structures. (DSMF ¶ 2.) There is nothing in the record that precludes the conclusion that these net pens, which confine fish in a concentrated area and have substances flowing out of them into the waters, are structures.

ing pipes." (*Id.* at 8.) ASM concludes that net pens do not involve "discharging pipes," therefore they cannot be point sources.[13] (*Id.*)

However, there is no basis for concluding that the phrase "ponds, raceways, or other similar structures" narrowly focuses on pipes, conduits, or the channeling of water. In cases involving "classic" point source discharges, surface water runoff, or stormwater, the use of buzzwords and phrases such as "collect and direct the flow," "pipe discharge," "self-contained, solid facilities," and "gathering and funneling of water," is relevant because the existence of such items is often dispositive.[14] But the term "point source" covers a broader means of discharging. As early as 1974, the Act has defined "point source" as:

> [A]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

from which pollutants are or may be discharged.

33 U.S.C. § 1362(14) (emphasis added)[15]

*See United States v. Holland,* 373 F.Supp. 665, 668 (D.Fla.1974)(quoting definition of "point source" with same language used today). The examples listed in section 1362(14) illustrate that a "point source" exists regardless of whether a pipe, a solid structure, or funneled/channeled water is involved.

Further, numerous cases reflect the broad means of discharging which constitute "point sources." *See, e.g., Romero–Barcelo v. Brown,* 478 F.Supp. 646, 664 (D.P.R.1979), *rev'd on other grounds,* 643 F.2d 835 (1st Cir.1981), *aff'd sub nom. Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (aircraft from which the release or firing of ordnance into the water is a point source); *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983) (bulldozers and backhoes constitute point sources); *Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114, 119 (2nd Cir.1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995) (ma-

---

13. The designation of "nonpoint source" is limited to circumstances in which it is difficult to ascribe the discharge to a single polluter or to any identifiable point of discharge. *See, e.g., United States v. Earth Sciences, Inc.,* 599 F.2d 368, 371 (10th Cir.1979) ("Because nonpoint sources of pollution, such as oil and gas runoffs caused by rainfall on the highways, are virtually impossible to isolate to one polluter, no permit or regulatory system was established as to them."); *United States v. Plaza Health Lab., Inc.,* 3 F.3d 643, 647 (2nd Cir.1993) ("Very simply, a non-point source of pollution is one that does not confine its polluting discharge to one fairly specific outlet...." (citing S.Rep. No. 92–414, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3760)).

14. Classic point source discharges involve things like pipes, in part because "pipes and similar conduits are needed to carry large quantities of waste water, which represent a

large portion of the point source pollution problem... and are readily classified as point sources." *United States v. Plaza Health Lab., Inc.,* 3 F.3d 643, 651 (2nd Cir.1993) (Oakes, J., dissenting). Surface water runoff does not constitute discharge from a point source unless it is channeled or collected. *See Sierra Club v. Abston Const. Co.,* 620 F.2d 41, 47 (5th Cir.1980) (stating that the point source definition "excludes unchanneled and uncollected surface waters" (citing *Consolidated Coal Co. v. Costle,* 604 F.2d 239, 249 (4th Cir.1979) and *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1373 (4th Cir.1976))).

15. The EPA states that although the Act does not specifically address CAAPFs, CAAPFs are a type of " 'concentrated animal feeding operation' which the CWA explicitly identifies as a 'point source.' " 65 Fed.Reg. 4,3586, 73,649 (July 13, 2000).

nure spreader which distributed manure in field deemed a point source); *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 308 (3rd Cir.1997), *cert. denied*, 522 U.S. 1052, 118 S.Ct. 700, 139 L.Ed.2d 644 (1998) (barge from which cement blocks were dumped and paint chips from sandblasting were projected is a point source); *Stone v. Naperville Park Dist.*, 38 F.Supp.2d 651, 655 (D.Ill.1999) (shooting range where lead shots and air borne clay targets ultimately land in the water is a point source). *See also United States v. Plaza Health Lab., Inc.*, 3 F.3d 643, 651–652 (2nd Cir.1993) (Oakes, J., dissent listing cases) and *Long Island Soundkeeper Fund, Inc. v. N.Y. Athletic Club*, 1996 WL 131863, *13 (D.N.Y.1996) (listing cases). Rather than focusing on pipes, conduits, and the channeling of water, as ASM suggests, the courts find that a point source exists where there is an *identifiable* source from which the pollutant is released.[16]

An argument similar to ASM's was rejected in *Stone v. Naperville Park Dist.*, 38 F.Supp.2d 651 (D.Ill.1999), which involves a citizen suit brought under the CWA against the operators of a trap shooting facility. In *Stone*, the plaintiffs claimed that the defendants' facility discharged lead shot into navigable waters without an NPDES permit thereby violating the Act. *Stone*, 38 F.Supp.2d at 652. On plaintiff's motion for summary judgment, the court noted that the facility consisted of three firing stations, several target throwers, and a fenced shotfall zone where shooting debris would fall. *Id.* The

defendants conceded that they discharged pollutants into navigable waters, thus, the sole issue was whether the facility constituted a "point source." *Id.* at 656. After considering defendants' argument that the shooting range "is a place, wholly unlike a discrete item like a pipe or container, that does not discharge or channel anything," the court concluded "the range 'channels' shooting by providing a facility at which individuals may shoot; it channels the discharge of pollutants by inviting individuals to come shoot at airborne clay targets that land in the water with lead shot that also land in the water." *Id.* at 655. The court found that the range qualified as a point source and was in violation of the Act. *Id.* at 656.

The Act's definition of "point source" and the caselaw identifying various point sources do not support ASM's conclusions that the phrase "ponds, raceways, or other similar structures" relates only to facilities with "discrete discharging pipes" or its conclusion that its net pens operations cannot be considered point sources. Instead, the Act and the caselaw lead to the conclusion that the release of pollutants from ASM's net pens into the bay constitutes an identifiable, discernible, confined, and discrete emission or conveyance into the water. To conclude that ASM's net pen operations could not constitute point sources would be contrary to twenty years of caselaw and would ignore the EPA's interpretation that Appendix C is applicable to net pen sea farms.[17] For these reasons, ASM's argument that its net pen opera-

---

16. The EPA has the same interpretation: that the term "point source" includes "all discrete, identifiable sources from which pollutants are emitted or conveyed into the United States waters." *Long Island Soundkeeper Fund, Inc. v. N.Y. Athletic Club*, 1996 WL 131863, *13 (D.N.Y.1996) (citing Amicus Brief of the United States at 6 and finding that a trap shooting range designed to concentrate shooting activity from a few specific points, systematically directed in a single direction, is an identifiable source from which

spent shots and target fragments are conveyed into navigable waters).

17. In a 2000 final rulemaking decision, the EPA stated, "[m]ost commercial fish husbandry that the layperson refers to as 'aquaculture,' including fish farms *located in waters* of the U.S., is subject to NPDES regulation under the rubric 'concentrated aquatic animal production facility.'" 65 Fed.Reg. 43,586, 43,648–649 (July 13, 2000)(emphasis added). This comment was made in explaining and

tions cannot be characterized as point sources fails, as well as its assertion that Appendix C focuses narrowly on pipe discharges.[18]

Based on the foregoing, USPIRG has meet its summary judgment burden of demonstrating that ASM has been and currently is "discharging pollutants" without a NPDES permit in violation of the Clean Water Act. USPIRG provides sufficient support and record evidence to compel the conclusion that net pens fall within the scope of Appendix C. ASM's unsupported assertion that the EPA intended to narrowly regulate enclosed, land-based structures with discharging pipes does not compel an alternate conclusion. In sum, the Clean Water Act and the caselaw identifying various point sources support the conclusion that Appendix C is applicable to ASM's sea net pen operations. Additionally, the EPA has expressed its interpreta-

tion that the phrase "ponds, raceways, and other similar structures" encompasses net pen sea farms. (DSMF ¶ 5.) It is undisputed that ASM's facilities, except the Libby Island site, meet the quantitative criteria under Appendix C for AAPFs "automatically" deemed to be CAAPFs (PSMF ¶¶ 96–98; DRSMF ¶¶ 96–98) and ASM concedes that its farms are "concentrated aquatic animal production facilities." (DMSJ at 3, 7, 11; Def.'s Resp. to Pls.' Mot. Summ. J. (DRMSJ) at 5.) Based on the foregoing, as a matter of law I conclude that ASM's farms are CAAPFs as defined in Appendix C.[19] Under the regulation, all CAAPFs are prohibited from discharging pollutants unless an NPDES permit has been obtained. *See* 40 C.F.R. § 122.24(a). ASM's salmon farms (with the exception of the Libby Island site) discharge pollutants without an NPDES permit and therefore are in violation of the Act.[20] *See* 33 U.S.C. § 1311(a); (*See also*

correcting a mischaracterization the EPA made in a proposed rule preamble in which the EPA differentiated between "aquaculture projects" (regulated under § 122.25) and "concentrated aquatic animal production facilities" (regulated under § 122.24). (*Id.*) The mischaracterization suggested that aquaculture projects confine aquatic stock *within jurisdictional waters* whereas AAPFs do *not* confine aquatic stock within jurisdictional waters but discharge to jurisdictional waters. (*Id.*) After reviewing the "original CWA legislative history, the regulations for aquaculture and aquatic animal production facilities, and past Agency statements on the matter," the EPA corrected their error, stating that the difference between aquaculture projects and AAPFs "is not based on the location of aquatic stock confinement relative to jurisdictional waters of the United States." *Id.*

18. I note that my determination that ASM's operations fall within the definition of a point source is limited to the purpose of refuting ASM's argument that its net pen operations cannot be classified as a "point source" pursuant to the CAAPF regulation, 40 C.F.R. § 122.24(a), (b), and Appendix C. My analysis should not be construed to contradict the EPA's determination of which salmon farms

constitute CAAPFs and are therefore deemed to be point sources under 40 C.F.R. ¶ 122.24. In other words, all CAAPFs are point sources under Appendix C, but not all salmon farms are necessarily CAAPFs. That determination would be based on whether the farm fell within the criteria of Appendix C or, in the case of an AAPF that did not met the criteria of Appendix C, by a site visit and a designation by the EPA that the farm constitutes a CAAPF.

19. As I find that ASM's farms constitute CAAPFs, I need not address USPIRG's alternate argument that ASM's farms are "aquaculture projects" operating without a permit in violation of the Act. Clearly they are *not* aquaculture projects. *See* 65 Fed.Reg. 43586, 43649 (July 13, 2000) (stating that the EPA regulations for "aquaculture projects" do not apply to fish farms or fish hatcheries).

20. There is a dispute to whether ASM should be held liable for Clean Water Act violations at its wholly owned subsidiaries, Treat's Island and Island Aquaculture. Additionally, it is unclear in the factual record whether the Treat's Island and Island Aquaculture salmon farms fall within the quantitative require-

PSMF ¶¶ 60, 65–66, 70, 75, 78, 84; DRSMF ¶¶ 60, 65–66, 70, 75, 78, 84.)

### B. ASM's Affirmative Defenses

 In its opposition to plaintiffs' motion for summary judgment, ASM raises three affirmative defenses to USPIRG's citizen suit. Despite USPIRG's challenge regarding ASM's timing in raising these defenses, I will briefly address them, as they are potentially dispositive of this matter. First, ASM asserts that it is exempt from the "zero-discharge standard" in § 1311(a) under a narrow exception created in *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523 (11th Cir.1996). (DRMSJ at 5.) *Hughey* stands for the proposition that "Congress did not intend…for the zero discharge standard to apply when: (1) compliance with such a standard is factually impossible; (2) no NPDES permit covering such discharge exists; (3) the discharger was in good-faith compliance with local pollution control requirements that substantially mirrored the proposed NPDES discharge standards; and (4) the discharges were minimal." *Hughey*, 78 F.3d at 1530. The court in *Hughey* concluded that the law does not compel the doing of the impossible. *Id.*[21] ASM claims that it is impossible for its farms to comply with a zero-discharge standard because like the defendant's inability to pre-vent rainwater in *Hughey*, ASM cannot prevent the alleged discharge of pollutants at its facilities. (DRMSJ at 7–8.) ASM argues that it must feed its salmon, that it must medicate the salmon, and that it cannot prevent the discharge of fish wastes or medicine into the water. (*Id.*) ASM further asserts that compliance with the NPDES permit requirement is "impossible" because "no NPDES permit exists" for its salmon farms. (*Id.*) ASM ex-plains that it was not required to have a permit in 1987 when its operations began, but then in 1990 it was informed that it would be required to have a permit. (*Id.*) After ASM submitted an NPDES application, eleven years passed without any EPA action. (*Id.*) ASM adds that it is in compliance with local pollution control requirements and that its discharges are minimal. (*Id.* at 8–9.)

 The very narrow *Hughey* exception is not applicable in this case. Unlike the discharger in *Hughey*, ASM does not meet all four of the necessary requirements. First, in *Hughey*, there was no permit procedure available to the defendant through the state or the EPA for its discharging actions. *Hughey*, 78 F.3d at 1527, n. 7. Thus, in *Hughey*, it was impossible for the defendant to obtain a permit from any governmental agency. *Id.* ASM is in a factually different circumstance. Since 1979, the EPA has had a permit procedure for CAAPFs in place which was adopted in 40 C.F.R. § 122.24. 44 Fed.Reg. 32,854, 32870 (June 7, 1979) (final rule to be codified at 40 C.F.R. § 122.43, effective June 14, 1979, requiring permits for CAAPFs and allowing case-by-case determination for AAPFs). In 1990, the EPA informed ASM that its operations required an NPDES permit. (PSMF ¶ 9: DRSMF ¶ 9.) ASM followed the procedure that was in place by submitting an NPDES application. (PSMF ¶¶ 10, 18.) Although the EPA apparently failed to follow up after ASM's application was submitted, there is nothing in the record to indicate that the EPA could not have issued an NPDES permit for ASM's activities. In other words, despite the fact that the EPA did not respond to ASM's application, an NPDES permit for the type of activities ASM engaged in could be obtained from the EPA at that time.[22] A discharger of

ments of a CAAPF under Appendix C of Part 122.

21. The First Circuit has not had an occasion to address the *Hughey* exception.

22. In *Hughey,* the state had NPDES permit-

pollutants cannot avoid liability for violating the zero-discharge standard by asserting that it applied for an NPDES permit but for some administrative failure, the EPA failed to issue a permit.[23] *See, e.g., Beartooth Alliance v. Crown Butte Mines,* 904 F.Supp. 1168, 1174 (D.Mont.1995) ("To be in compliance with the CWA, it is necessary to not only apply for, but also to have a permit." (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.,* 13 F.3d 305, 309 (9th Cir.1993)); 33 U.S.C. §§ 1311(a), 1342(a); and *United States v. Tom–Kat Dev., Inc.,* 614 F.Supp. 613, 614–615 (D.Alaska 1985) (holding that when the EPA fails to process an application, defendant's good faith efforts to obtain an NPDES permit does not shield defendant from liability for CWA violations)).

Second, unlike the defendant in *Hughey,* it is not *impossible* for ASM to comply with a zero-discharge standard. The court in *Hughey* noted the county inspector's testimony that "zero discharge of storm water will never be achieved because rainfall must find its way back into the streams and rivers of this state." *Hughey,* 78 F.3d at 1530. The court distinguished the matter from "a case of a manufacturing facility that could abate the discharge of pollutants by ceasing operations." *Id.* ASM's argument that it is "impossible" to prevent the discharge of pollutants centers on the existence and subsistence of the

salmon, which ASM introduced to the net pens. In essence, ASM is responsible for creating a circumstance in which the discharge of pollutants is required in order for it to continue to operate in the same manner. Conversely, the defendant in *Hughey* did not create the resulting discharge; as the court stated, "rain water will run downhill and not even a law passed by Congress . . . can stop that." *Id.* The factual disparities between *Hughey* and this case and ASM's inability to meet all four elements of *Hughey* compel the conclusion that the narrow exception recognized in *Hughey* does not apply here.

ASM's second affirmative defense asserts that USPIRG's claim is barred by laches. (DRMSJ at 10.) A party asserting laches has the burden of demonstrating that "a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party." *Iglesias v. Mut. Life Ins. Co. N.Y.,* 156 F.3d 237, 243 (1st Cir.1998) (quoting *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 911 (1st Cir.1989)). As ASM correctly concedes, laches is a disfavored defense in environmental cases because the plaintiff is not the only party to suffer harm by the alleged environmental damage. *See Portland Audubon Soc'y v. Lujan,* 884 F.2d 1233, 1241 (9th Cir.1989) ("We have repeatedly cautioned against application of the equitable doctrine of laches to public interest environmental liti-

---

ting authority but had not yet developed a permit for the regulation of rainwater discharges. *Hughey,* 78 F.3d at 1527 & n. 7–8. Thus, the state was *unable* to provide defendant with a permit. *Id.* Defendant could not turn to the EPA for a permit because the EPA's authority to issue permits had been transferred to the state once the state delegation occurred. As it was impossible for defendant to control rainwater and impossible for defendant to obtain a permit from any governmental agency, the court found that it was impossible for the defendant to comply with the CWA. *Id.* at 1527, 1530.

**23.** ASM recognizes that they cannot avoid liability merely because it submitted an NPDES application. (DRMSJ at 10, n. 3.) Instead, ASM asserts that the "EPA, through DMR and the joint federal-state implementing program . . . provided that, assuming an application were filed, ASM could continue operations." (*Id.*) ASM argues that it should not be punished for relying on what the EPA and DMR instructed. (*Id.*) As I have considered and rejected this argument below, I refrain from doing so here.

gation. Laches must be invoked sparingly in environmental cases.... This approach has found unanimous support in the other circuits." (citing *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982))). ASM relies on the First Circuit decision in *Concerned Citizens on I–190 v. Sec'y of Transp.*, 641 F.2d 1 (1st Cir.1981), to support its defense. However, this decision was not made in the context of a citizen suit under the Clean Water Act. Although, many courts find laches inappropriate in citizen suits under the Clean Water Act (*Student Pub. Interest Research Group, Inc. v. P.D. Oil & Chem. Storage, Inc.*, 627 F.Supp. 1074, 1085 (D.N.J.1986)) (stating that in citizen suits plaintiffs stand as private attorneys general, therefore laches should not apply to bar the suit), some courts allow the defense when the plaintiff has engaged in some affirmative misconduct. *See, e.g., Nat'l Wildlife Fed'n v. Consumers Power Co.*, 657 F.Supp. 989, 1011 (D.Mich.1987), *reversed on other grounds*, 862 F.2d 580 (6th Cir.1988) (finding that because "plaintiff is in essence acting as a private attorney general in this matter, it probably is not subject to the doctrine of laches, at least absent a showing of some affirmative misconduct." (citing *Student Pub. Interest Research Group*, 627 F.Supp. at 1085 and *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1050 (D.Mo.1984))). There is no evidence in the record to suggest that plaintiffs, the State of Maine, or the EPA engaged in any affirmative misconduct.

Moreover, there is nothing in the record that supports ASM's assertion that it endured undue prejudice as a result of USPIRG's alleged delay in bringing this action. This is not a case where "prejudice to the defendant flows from the plaintiff's delay." *See Murphy v. Timberlane Reg'l Sch. Dist.*, 973 F.2d 13, 17 (1st Cir.1992). USPIRG brought this action in the fall of 2000. ASM complains that plaintiffs could have, but did not, take action when it

began operations in 1987 and ASM has continued to develop and invest in its facilities over the past fourteen years. (DRMSJ at 11.) However, during most of this time ASM has been aware that its facilities may be subject to the NPDES permit requirement. ASM has not shown that misconduct by USPIRG altered ASM's obligation or ability to comply with the NPDES permit requirement. Further, ASM has failed to demonstrate that USPIRG's delay in bringing the citizen suit was unreasonable. *See, e.g., N.C. Wildlife Fed'n v. Woodbury*, 1989 WL 106517, *4 (D.N.C.1989) (ruling on motion for summary judgment in a Clean Water Act action and stating that "Laches will bar a suit in equity where plaintiff's 'lack of diligence is wholly unexcused; and both the nature of the claim and the situation of the parties was such as to call for diligence.'").

ASM claims in its third affirmative defense that USPIRG's citizen suit is barred by equitable estoppel. (DRMSJ at 13.) To successfully assert this defense, a defendant must show that he (1) "reasonably" relied on plaintiff's conduct (2) "in such a manner as to change his position for the worse." *Conn. Fund for the Env't, Inc. v. Upjohn Co.*, 660 F.Supp. 1397, 1411 (D.Conn.1987) (citing *Heckler v. Comty. Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984)). ASM asserts that in a citizen suit USPIRG is "treated the same as the federal government for purposes of equitable estoppel." (DRMSJ at 13, n. 4.) ASM acknowledges it has an uphill battle, as courts are reluctant to find estoppel against the government. (*Id.* at 13.)

A defendant raising equitable estoppel against the government must show that the government engaged in "affirmative misconduct" *See, e.g., United States v. Marine Shale Processors*, 81 F.3d 1329, 1349–1351 (5th Cir.1996). At a minimum, the

government official must have intentionally or recklessly misled ASM. *Id.* at 1350. Mere negligence does not rise to the level of affirmative misconduct. *Id.* (citing *Kennedy v. United States*, 965 F.2d 413, 421 (7th Cir.1992)). In support of its defense, ASM claims that the EPA did not require a permit when it began operating in 1987 and ASM relied on this position when its facilities were established. (DRMSJ at 14). Then in 1990, the EPA informed ASM that they were subject to the NPDES permit requirement. (*Id.*; DSMF ¶ 9.) In 1992, the Maine Department of Marine Resources, on behalf of the EPA, represented that ASM did not need to do more than file a Notice of Intent to be covered by an NPDES permit.[24] (DRMSJ at 14.) As ASM had already filed applications for its existing sites, ASM concluded it was in full compliance with DMR's instructions. (*Id.*) ASM adds that the EPA failed to take action on ASM's NPDES applications. (*Id.*)

There is no evidence in the record to find that the DMR statement was made with the knowledge of falsity or with the intent to mislead. The facts do not support a conclusion that the statements were a result of anything more than negligence. ASM's additional argument that it relied on EPA's silence or failure to act during the years following ASM's submission of its NPDES application is unavailing. The Supreme Court has stated that "citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (quoting S.Rep. No. 92–414, at 64 (1971), *reprinted in* 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1482 (1973), U.S.Code Cong. & Admin.News 1972, pp.3668, 3730). "If private citizen plaintiffs were estopped from maintaining a suit because of waivers or inaction by government officials, the effectiveness of section 505 [i.e. the citizen suit provision § 1365] would be drastically curtailed and its purpose defeated." *Student Pub. Interest Res. Group of N. J., Inc. v. Hercules, Inc.*, 1986 WL 6380, *8 (D.N.J.1986).[25]

---

**24.** ASM introduces into the record information related to a monitoring program, informational guidelines, and a combined agency application for aquaculture farms that collected the information required by the relevant agencies. (DSMF ¶¶ 12–17.) ASM states that the Maine Department of Marine Resources (DMR) took a lead position on an aquaculture farm monitoring program coordinated by DMR and certain representatives of Federal agencies, including the EPA. (DRRMSJ at 3.) ASM suggests that the DMR's lead position in the monitoring program and/or the multi-agency application is evidence demonstrating that the EPA did not intend to move forward with the NPDES program so long as the sea farms were adequately regulated by DMR's monitoring program. (DRRMSJ at 4.) However, the record does not support this assertion nor does it show that DMR's monitoring program, the guidelines, or the combined agency application was created to be a substitute for a NPDES permit. (*See* Culley Decl. I Ex. 9–13.)

**25.** The alleged 1992 Maine Department of Marine Resources statement, if shown to be said on behalf of the EPA, may be considered as a factor influencing the imposition of civil penalties and the nature, if any, of injunctive relief. In January 2001, the EPA granted the State of Maine the authority to issue NPDES permits in the state. (DSMF ¶ 21.) According to the record, the State agreed to issue "draft" permits for Maine salmon farms that constitute CAAPFs by November 2001. (*Id.* ¶ 22, Culley Decl. I Ex. 16 at 4, section III(A)(10).) The agreement further indicates that the State will issue final permits within six months following the draft permits. (*Id.* Culley Decl. I Ex. 16 at 4.) At this time, there is no indication that the State has issued draft permits or final permits. Nonetheless, the State's delay has no bearing on the issue of liability here. ASM submitted its permit applications to the EPA in the early 1990s and although ASM did not receive permits, ASM proceeded to discharge pollutants. ASM's reliance on statements, actions, or inaction of

As ASM has not met its burden in demonstrating affirmative misconduct on the part of the government, estoppel should not be a bar to USPIRG's citizen suit.

### Conclusion

I recommend that the Court **DENY** ASM's motion for summary judgment and **GRANT** USPIRG's motion for summary judgment on the issue of liability under the Clean Water Act and grant declaratory relief providing that ASM is required to obtain an MEPDES permit from the State of Maine[26] or an NPDES permit from the EPA in order to lawfully discharge pollutants into Machias Bay or Pleasant Bay. I further recommend that the Court schedule a hearing on the issue of what, if any, civil penalty or injunctive relief is appropriate in this case. Certainly the inaction and the delay of the permitting authorities, both the EPA and now the State, may be a factor that the court considers when fashioning its relief. *See United States v. BP Oil, Inc.,* No. 86–0792, 1989 WL 83623, *5 (E.D.Pa. July 27, 1989) ("If any action or inaction by the government contributed to defendant's violations, these facts can be considered when a remedy is fashioned.")

### *NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is

sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Feb. 19, 2002.

the EPA is an issue more appropriately addressed when considering whether to impose civil penalties or to order injunctive relief. *See United States v. BP Oil, Inc.,* 1989 WL 83623, *5 (D.Pa.1989); *Conn. Fund for the Env't, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1412 (D.Conn.1987) (citing *Heckler v. Comty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Student Pub. Interest Research Group of N.J. v. Monsanto,* 600 F.Supp. 1479, 1486 (D.N.J.1985); *United States v. Amoco Oil,* 580 F.Supp. 1042, 1050 (D.Mo.1984)).

**26.** In January 2001, the State of Maine was approved to administer the NPDES program in Maine. *See* 66 Fed.Reg. 12,791, 12,792 (Feb. 28, 2001). The Maine permits to be issued equivalent to the NPDES permit is referred to as the "Maine Pollutant Discharge Elimination System" permit or MEPDES permit. (*Id.*) Although the State of Maine has permitting authority, the EPA has the authority in certain circumstances to issue an NPDES permit itself. (*Id.*)