**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2184

NORTH CAROLINA COASTAL FISHERIES REFORM GROUP; JOSEPH WILLIAM ALBEA; DAVID ANTHONY SAMMONS; CAPTAIN SETH VERNON; CAPTAIN RICHARD ANDREWS; DWAYNE BEVELL,

> Plaintiffs - Appellants,

v.

CAPT. GASTON LLC; ESTHER JOY, INC.; HOBO SEAFOOD, INC.; LADY SAMAIRA INC.; TRAWLER CAPT. ALFRED, INC.; TRAWLER CHRISTINA ANN, INC.; TRAWLERS GARLAND AND JEFF, INC.,

> Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. Louise W. Flanagan, District Judge. (4:20−cv−00151−FL)

Argued: October 25, 2022                    Decided: August 7, 2023

Before RICHARDSON and RUSHING, Circuit Judges, and Sherri A. LYDON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Rushing and Judge Lydon joined.

**ARGUED:** James L. Conner II, CALHOUN, BHELLA & SECHREST, LLP, Durham, North Carolina, for Appellants. Brian David Schmalzbach, MCGUIREWOODS LLP, Richmond, Virginia, for Appellees. **ON BRIEF:** Shannon M. Arata, CALHOUN, BHELLA & SECHREST, LLP, Durham, North Carolina, for Appellants. David N.

Ventker, Marissa M. Henderson, VENTKER HENDERSON, PLLC, Norfolk, Virginia, for Appellee Esther Joy, Inc.  Stevenson L. Weeks, WHEATLY, WHEATLY, WEEKS & LUPTON, PA, Beaufort, North Carolina; Charles D. Case, W. Dixon Snukals, Raleigh, North Carolina, Henry L. Kitchin, Jr., MCGUIREWOODS LLP, Wilmington, North Carolina, for Appellees Capt. Gaston LLC; Lady Samaira, Inc.; Trawler Capt. Alfred, Inc.; Trawler Christina Anne, Inc.; Hobo Seafood, Inc.; and Trawlers Garland and Jeff, Inc.

RICHARDSON, Circuit Judge:

Fisheries Reform Group alleges that shrimp trawlers operating in North Carolina's Pamlico Sound are violating the Clean Water Act by engaging in two types of unpermitted activity: throwing bycatch overboard and disturbing sediment with their trawl nets. But these activities do not violate the Clean Water Act. The Act forbids the unpermitted discharge of a pollutant. Returning bycatch to the ocean is not discharging a pollutant, so throwing it overboard without a permit is not forbidden by the Act. Likewise, because the trawl nets merely kick up sediment already present in the Sound, their use does not discharge any pollutants either. Accordingly, we affirm the district court's dismissal of Fisheries' complaint.

## I.     Background

Defendants are commercial shrimpers in Pamlico Sound, a coastal estuary in North Carolina. Shrimpers harvest shrimp by dragging trawl nets along the ocean's floor. The nets trap shrimp. But, along the way, the nets also stir up sediment, which later resettles on the ocean floor. They also inadvertently snare other fish and marine organisms. These other fish and marine organisms, many of which the trawlers cannot legally keep, are known as "bycatch." Trawlers throw the bycatch overboard, returning it to the ocean.

Fisheries Reform Group seeks to change or limit the way trawlers discard bycatch and disturb sediment. To do so, it sued under the Clean Water Act's citizen-suit provision, alleging that these shrimpers are violating the Act and must obtain Clean Water Act permits—on top of the fishing permits already required—to engage in commercial shrimping. The district court dismissed the suit for failure to state a claim, holding that the

3

Act does not regulate bycatch and that disturbing sediment with trawl nets does not violate the Act.

## II.  Discussion

We affirm the district court's decision that Fisheries Reform Group fails to plausibly allege that shrimp trawlers are violating the Clean Water Act by either (1) throwing their bycatch back into Pamlico Sound, or (2) disturbing sediment on the Sound's floor with their trawl nets, thereby causing it to resettle.

The Clean Water Act is a comprehensive scheme to reduce water pollution in the United States. *See generally* 33 U.S.C. § 1251 *et seq.*  Among other things, it prohibits "the discharge of any pollutant by any person" "[e]xcept as in compliance with" the Act.[1] § 1311(a).  To comply with the Act, would-be polluters can obtain permits that authorize them to discharge pollutants.  Two such permits are relevant here.  First, the Environmental Protection Agency can issue National Pollutant Discharge Elimination System permits, which authorize "the discharge of any pollutant" so long as certain conditions prescribed by the EPA are satisfied.  § 1342(a)(1).  Second, the Army Corps of Engineers can issue permits under § 1344 authorizing the discharge of "dredged or fill material into the

---

[1] "[A] discharge of a pollutant occurs when five elements exist: (1) a pollutant must be (2) added (3) to navigable waters (4) from (5) a point source." *U.S. Pub. Rsch. Grp. v. Atl. Salmon of Me., LLC*, 215 F. Supp. 2d 239, 246 (D. Me. 2002) (internal quotation marks omitted).  The parties do not dispute that Pamlico Sound is part of the navigable waters.  Nor do they dispute that the shrimp boats are "a point source," which the Act defines to include "any . . . vessel or other floating craft." § 1362(14).  So we focus on whether a pollutant was added.

4

navigable waters at specified disposal sites."[2]  § 1344(a).  Fisheries alleges that because

the shrimpers are operating without these permits, they are violating the Act.

### A.      Fisheries' bycatch claim fails

Fisheries claims that the shrimpers are violating the Clean Water Act's prohibition

on the "discharge" of "pollutants" by putting bycatch back into Pamlico Sound without a

Clean Water Act permit.  Bycatch, they argue, is a pollutant.  A "pollutant" is defined to

"mean[ ]," among other things, "biological materials."[3]  § 1362(6).  "Biological materials"

is not further defined, but Fisheries argues that it encompasses all animal matter, including

the marine organisms that make up bycatch.  *See, e.g.*, *Biological*, American Heritage

Dictionary of the English Language (1976) ("Of, pertaining to, caused by, or affecting life

or living organisms."); *Material*, American Heritage Dictionary of the English Language

(1976) ("The substance or substances out of which a thing is or may be constructed.").

So, relying on § 1362's literal language, Fisheries asserts that bycatch is a

"pollutant" because it is within what it claims is the ordinary meaning of "biological

materials."  And a "discharge of a pollutant" is defined to include "any addition of any

pollutant to navigable waters from any point source."  § 1362(12).  Putting these definitions

---

[2] Both the EPA and the Corps can delegate their authority to issue permits to the individual states if certain conditions are met.  *See* §§ 1342(b), 1344(g), (h).  For simplicity's sake, we refer only to the EPA and the Corps in this opinion.

[3] The Act's definition of "pollutant" reads, in part: "The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  § 1362(6).

together, Fisheries argues that dumping bycatch back into the ocean from a boat after it was hauled onboard by nets plausibly amounts to an addition to the ocean. On this theory, discharging bycatch without a permit would violate the Act.

That sounds plausible. And, viewed in isolation, we might well agree. Faced with a statute, we typically determine the text's meaning based on the ordinary understanding of the language. And considering only the statutory text, Fisheries makes a plausible case for why returning bycatch to the ocean fits within the ordinary meaning of a "discharge" of "biological materials."[4]

Yet, in appropriate cases, we have been instructed to consider, as a background rule, other legal interests that contextually inform our understanding of a statute's meaning. For example, the rule of lenity teaches that we must resolve ambiguities in criminal statutes in favor of the criminal defendant. Other examples of background interpretive principles or rules of construction abound: constitutional avoidance, presumptions against implied repeal, liberal constructions to benefit Indians or soldiers, or the presumptions against retroactive or extraterritorial application. These background principles influence our

---

[4] Indeed, the Sixth Circuit essentially agrees with Fisheries' expansive definition of "biological materials" in the Act. *See Nat'l Cotton Council of Am. v. E.P.A.*, 553 F.3d 927, 937–38 (6th Cir. 2009); *Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 583 (6th Cir. 1988). Meanwhile the Ninth Circuit has limited its reading of "biological materials" to "waste material of a human or industrial process," *Ass'n to Protect Hammersley, Eld, & Toten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1016 (9th Cir. 2002), but we have good reason to doubt its logic since it reached its conclusion by misapplying the linguistic canon of *ejusdem generis*, *see id.* (applying *ejusdem generis* even though the Act's definition of pollutant is not an illustrative list and "biological materials" is not a catchall phrase following more-specific enumerated categories).

6

reading of a statute, sometimes even moving us to interpret a provision differently than we might otherwise.

Recently, the Supreme Court formalized another background principle: the major-questions doctrine. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608–14 (2022); *see also Biden v. Nebraska,* 143 S. Ct. 2355, 2372–75 (2023). This background rule requires clear congressional authorization for agency action in "extraordinary cases" when the "history and breadth" and "economic and political significance" of the action at issue gives us "'reason to hesitate before concluding that Congress' meant to confer such authority" to act on the agency. *West Virginia*, 142 S. Ct. at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). The doctrine's boundaries remain hazy,[5] but the Supreme Court's cases provide helpful guideposts.

As its name suggests, the major-questions doctrine applies only when the question at issue—*i.e.*, the authority the agency is claimed to have—is a major one. That is, the question must have significant political and economic consequences. *See, e.g.*, *Nebraska*,

---

[5] One ongoing debate is whether the major-questions doctrine is a clear-statement rule. Some believe that it is. *See* Cass R. Sunstein, *There Are Two "Major Questions" Doctrines*, 73 Admin. L. Rev. 475, 483–84 (2021); *see also West Virginia*, 142 S. Ct. at 2616–17, 2619 (Gorsuch, J., concurring). But clear-statement rules sit uncomfortably with our commitment to textualism. *See* Antonin Scalia, *A Matter of Interpretation* 27–29 (1997) (arguing that substantive interpretive canons "load the dice for or against a particular result"); *see also Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring). So academics and the Supreme Court have rightfully plumbed the analytical foundations of clear-statement rules. *See* Stephen E. Sachs, *The Law of Interpretation*, 130 Harv. L. Rev. 1079, 1122–28 (2017); *Nebraska*, 143 S. Ct. at 2377 (Barrett, J., concurring); *see also* Tr. of Oral Arg. 59–60, *Ysleta del Sur Pueblo v. Texas*, No. 20-493 (Feb. 22, 2022) (Justice Kagan asking if the Court should "just toss . . . out" the substantive canons of interpretation). Yet, whatever its analytical foundation, an inferior court must simply apply the major-questions doctrine.

143 S. Ct. at 2372–73 (finding a major question where the Secretary of Education sought to free 43 million borrowers from their obligations to repay $430 billion in student loans); *West Virginia*, 142 S. Ct. at 2604 (applying the major-questions doctrine when agency plan would have worked an "aggressive transformation in the domestic energy industry"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) (holding that the authority to regulate "millions of small sources—including retail stores, offices, apartment buildings, shopping centers, schools, and churches" was a major question).

But that is not all. The Court has highlighted several other hallmarks that should send us searching for clear authorization from Congress before adopting an "expansive construction of the statute," *West Virginia*, 142 S. Ct. at 2608 (quoting *Brown & Williamson*, 529 U.S. at 160), that would generate an "[e]xtraordinary grant[ ] of regulatory authority," *id.* at 2609. One such hallmark is when the Act's structure indicates that Congress did not mean to regulate the issue in the way claimed. *See, e.g.*, *Util. Air*, 573 U.S. at 321–22; *Brown & Williamson*, 529 U.S. 138–39; *Nebraska*, 143 S. Ct. at 2373–74. Likewise, we might draw the same inference when there is a different, "distinct regulatory scheme" already in place to deal with the issue which would conflict with the agency's newly asserted authority. *See Brown & Williamson*, 529 U.S. at 143–46.

Similarly, we are more hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them previously. *See West Virginia*, 142 S. Ct. at 2610; *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor,* 142 S. Ct. 661, 666 (2022). Or when the asserted power raises federalism concerns. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172–73, 174 (2001); *see also*

8

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 141 S. Ct. 2485, 2489 (2021). And the Court has said that we should be skeptical when the asserted authority falls outside the agency's traditional expertise, *see West Virginia,* 142 S. Ct. at 2609, 2612–13, or is found in an "ancillary provision." *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 468 (2001); *West Virginia*, 142 S. Ct. at 2610. While these indicators are non-exhaustive and need not be present in every major-questions case, they are among the things that cause us to hesitate and look for clear congressional authorization before proceeding.

### 1. The major-questions doctrine applies to Fisheries' claim

In this context, these factors demand that we seek clear authorization from Congress before holding that the shrimpers need a Clean Water Act permit to return their bycatch to the Pamlico Sound. In other words, whether returning bycatch qualifies as a "discharge" of a "pollutant" under the Act is a major question, so the major-questions doctrine applies to Fisheries' suit.

To start, Congress has erected a "distinct regulatory scheme" to address the bycatch problem. *See Brown & Williamson*, 529 U.S. at 143–46. This scheme leaves regulating bycatch to the states and the National Marine Fisheries service—not the EPA.

Congress created this scheme when it passed the Magnuson-Stevens Act of 1976, just four years after it passed the Clean Water Act. *See* 16 U.S.C. §§ 1801, 1851. Under the Act, Congress maintained the *states'* primary authority over *state* waters like Pamlico Sound. *See* § 1856(a). Fisheries in state waters generally remain within the control of the

9

state unless it shirks its duty.[6]  By contrast, within *federal* waters (generally between 3 and 200 nautical miles from shore), *federal* authorities must create plans to address the problem of bycatch.  *See generally* Sustainable Fisheries Act, Pub. L. No. 104-297, 106 Stat. 66; *see also* 16 U.S.C. §§ 1851(a)(9), 1853(a)(11), 1881d, 1865.  But even in federal waters, the job of regulating fisheries falls within the authority, and expertise, of the National Marine Fisheries Service and Regional Fishery Management Councils, not the EPA.  This distinct regulatory scheme suggests that we should expect clear authorization from Congress before finding that it was effectively displaced by the Clean Water Act.  *See West Virginia*, 142 S. Ct. at 2612–13; *Brown & Williamson*, 529 U.S. at 144; *Train v. Colorado Pub. Interest Rsch. Grp., Inc.*, 426 U.S. 1, 23–25 (1976).

Adopting Fisheries' interpretation would upset the Magnuson-Stevens Act's federal-state balance and raise significant federalism concerns.  And Congress must be explicitly clear if it wishes to "alter[ ] the federal-state framework by permitting federal

---

[6] This federal scheme only reaches fisheries, and therefore bycatch, in state waters if, after notice and comment, the Secretary of Commerce concludes that "any State has taken any action, or omitted to take any action, the results of which will substantially and adversely affect the carrying out of [a fishery management plan implemented under the Act.]" § 1856(b)(1)(B); *see also* § 1856(a).

North Carolina has not shirked its duties to regulate bycatch in state waters.  It has had a detailed fishery-management plan for shrimp since 2006.  North Carolina Dept. of Envt'l and Nat. Res., *North Carolina Fishery Management Plan: Shrimp* (2006).  One of the original plan's stated goals was to minimize bycatch.  *Id.* at 2–3.  The Division of Marine Fisheries amended the plan in 2015, and again in 2022.  North Carolina Dept. of Envt'l and Nat. Res., *North Carolina Shrimp Fishery Management Plan Amendment 1*, (2015);  North Carolina Dept. of Envt'l and Nat. Res., *North Carolina Shrimp Fishery Management Plan Amendment 2* (2022).  A goal of the 2022 Amendment was to "[r]educe bycatch of non-target species."  *See Amendment 2*, at 2.  In furtherance of that goal, the Amendment included an extensive assessment of the bycatch issue and regulations intended to reduce bycatch.  *See id.* at 32–50, 114–292.

encroachment upon a traditional state power." *Solid Waste Agency*, 531 U.S. at 172–73, 174; *see also Sackett v. EPA*, 143 S. Ct. 1322, 1341 (2023).  This principle has played an important role in interpreting the Clean Water Act, leading the Supreme Court to reject an expansive interpretation of the Act because it "would result in a significant impingement of the States' traditional and primary power over land and water use." *Solid Waste Agency*, 531 U.S. at 174.

So too here.  Congress has repeatedly confirmed that states have the primary authority to regulate fishing in their waters.  Section 1251(b) of the Clean Water Act contains a states'-rights-saving clause:  "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use (including restoration, preservation, and enhancement) of land and water resources."[7]  33 U.S.C. § 1251(b).  Likewise, Congress has declared that states have "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters" and "the right and power to manage, administer, lease, develop, and use the said lands and natural resources," 43 U.S.C. § 1311(a), including "fish, shrimp . . . and other marine animal and

---

[7] Along with the saving clause, the Act also contains a list of "categories of sources" for which EPA must promulgate standards that limit the discharge of pollutants.  *See* 33 U.S.C. § 1316(b).  This list lacks any mention of bycatch or commercial fishing, despite targeting adjacent industries.  *See id.* (identifying "canned and preserved seafood processing" as a type of source).  The combination of these two provisions further suggests that the statute does not impliedly regulate bycatch.  *See Gonzales v. Oregon*, 546 U.S. 243, 272 (2006) ("In the face of the [Controlled Substance Act's] silence on the practice of medicine generally and its recognition of state regulation of the medical profession it is difficult to defend the Attorney General's declaration that the statute impliedly criminalizes physician-assisted suicide.").

11

plant life." § 1301(e). Congress has also said that "it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries." Act of May 11, 2005, Pub. L. No. 109-13, 119 Stat. 231, § 6036(b)(1). Accordingly, we must read the Clean Water Act—especially when it comes to fisheries—against a backdrop where Congress has time-and-time again confirmed that primary authority resides with the states. We thus demand "exceedingly clear language" from Congress to upend this delicate federal-state balance. *Sackett*, 143 S. Ct. at 1341.

Given this balance under the existing regulatory scheme, it is unsurprising that the EPA has never sought the authority to regulate bycatch in the fifty years since the Clean Water Act was passed. Indeed, the EPA does not even seek it now. Instead, Fisheries tries to foist this authority on it.[8] The EPA's own lack of confidence that it has this authority also suggests that this is a major-questions case. *Cf. West Virginia*, 142 S. Ct. at 2610 ("'[J]ust as established practice may shed light on the extent of power conveyed by general

---

[8] This fact makes our case different from other major-questions cases. In those cases, an agency asserted broad, nationwide power, resting its authority on a provision that did not clearly authorize such an assertion. Under those circumstances, "both separation of powers principles and a practical understanding" of how Congress legislates led the Court to seek clear congressional authorization. *West Virginia*, 142 S. Ct. at 2609.

Here, the EPA is not asserting such a power. In fact, it's not asserting anything since this is a citizen suit between private parties. But Fisheries is suing precisely because the EPA has not acted. Their suit is designed to compel EPA action.

If we sided with Fisheries, the immediate consequence would be to simply ban the shrimpers from throwing their bycatch into Pamlico Sound. That might sound like a small effect; yet the consequences would be vast. For, if we adopted Fisheries' reading of the statute and held that bycatch falls within the Act's definition of pollutant, then that same reading would force the EPA to regulate not just all bycatch, but virtually all fishing, through the Act's permitting scheme. The economic and separation-of-powers stakes of our ruling thus mirror those at play in other major-questions cases.

12

statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.'" (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 253 (1941))).

The authority that Fisheries seeks for the EPA would have significant political and economic consequences. *West Virginia*, 142 S. Ct. at 2608. Interpreting the Act to require the EPA to regulate bycatch would give it power over "a significant portion of the American economy." *See Brown & Williamson*, 529 U.S. at 159. Almost every commercial or recreational fishermen in America would be subject to the EPA's new regulatory control. Anyone who fishes from a boat using live bait, or by chumming, or who—after catching a fish—releases it back into the ocean, would violate the Clean Water Act unless they first obtained a Clean Water Act permit alongside their ordinary fishing permits.

For example, under Fisheries' proposed reading, when my daughter fishes on a boat by casting a hooked mud minnow into the sea, she has discharged a pollutant. She has taken a biological material (the minnow) and added it to the navigable waters (the sea) from a point source (the boat). And because she has done so without a permit, she faces crushing consequences. *See Sackett*, 143 S. Ct. at 1330 (noting the crushing criminal and civil consequences for even inadvertent violations of the Clean Water Act). So too if she—like most any fisherman—returns a fish that she caught, whether because she was targeting certain species, practicing catch and release, or complying with local harvesting limits or

13

bans.[9]  At argument, Fisheries sought to assure me that the EPA would not exercise its discretion to lock her up or take her allowance.  *See* Oral Arg. at 7:50–9:30.  Small comfort.

My daughter is not the only one who should be concerned.  The economic and social consequences would be enormous.  Fishing in America generates hundreds of billions of dollars, employs millions of people, and provides recreational sport for millions more.[10]  *See Nebraska*, 143 S. Ct. at 2373 (noting that $469 to $519 billion is "ten times the economic impact" that has triggered the major questions doctrine (internal quotation marks omitted)).  As Congress has recognized, "[c]ommercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation." 16 U.S.C. § 1801(a); *see also* 16 U.S.C. § 742a ("[T]he fish, shellfish, and wildlife resources of the Nation make a material contribution to our national economy and food supply.").  Forcing virtually every fisherman to risk punishment or obtain a permit from the EPA—separate from the existing state and federal schemes—would work an enormous effect.  *See Sackett*, 143 S. Ct. at 1335–36.[11]

---

[9] In 2020, recreational anglers took an estimated 199 million fishing trips and caught 1 billion fish, 65% of which—650 million fish—were returned to the ocean.  (And even these large numbers exclude fish caught to be put back in the ocean as bait.)  National Marine Fisheries Service, 2020 Fisheries of The United States 12–13 (May 2022).

[10] *See, e.g.*, National Marine Fisheries Service, Fisheries Economics of the United States 2020 (Feb. 2023); National Marine Fisheries Service, Fisheries Economics of the United States 2016 (Dec. 2016).

[11] At oral argument, Fisheries suggested in passing that the EPA could create a *de minimis* exception that would alleviate such concerns.  It did not identify a source of authority for this proposition, and it does not appear that there is one.  *See N.W. Env't Advocates v. EPA*, 537 F.3d 1006, 1020–22 (9th Cir. 2008).  Fisheries also suggested the

To recap, Fisheries is attempting to force the EPA to regulate bycatch, something that the agency itself has never sought to do and for which it lacks the relevant expertise. In doing so, Fisheries seeks to vastly expand the EPA's regulatory authority in a way that would upset the federal-state balance by intruding on states' authority to manage fisheries in their own waters and essentially moot the established scheme to regulate bycatch in federal waters. This sea-change would have an enormous impact on the recreational and commercial fishing industries; industries which Congress has specifically sought to protect. "Given these circumstances," "this is a major questions case." *West Virginia*, 142 S. Ct. at 2610.

### 2. Fisheries has not identified clear authorization from Congress to support its reading of the Clean Water Act

Because the major-questions doctrine applies, Fisheries must identify "clear congressional authorization" to regulate bycatch under § 1311 of the Clean Water Act. *See West Virginia*, 142 S. Ct. at 2609. Neither "vague terms" nor "oblique or elliptical language" will suffice. *Id.* (quoting *Whitman*, 531 U.S. at 468). Yet that is all Fisheries offers. It points only to the Act's definitional section defining "pollutant" to include "biological materials" and "discharge" to include "any addition." But the Supreme Court has made clear that this kind of language does not provide the required clear authorization.

---

EPA might use a general permit to cover these discharges. But it again failed to provide any authority for the EPA to do so. Given that Fisheries only referred to this possibility in passing, we need not definitively decide whether the EPA could, or would, promulgate a general permit here.

15

To start, the Supreme Court has twice rejected the idea that literal readings of the broad terms in the Clean Water Act's definitional section—§ 1362—supply clear authorization to regulate something under the Act. In *Train v. Colorado Public Interest Research Group Inc.*, 426 U.S. 1 (1976), the Court held that the meaning of "radioactive materials" under § 1362(6) did not include nuclear materials regulated under the Atomic Energy Act. *Train*, 426 U.S. at 7–8, 25. Those nuclear materials are certainly within the literal meaning of "radioactive materials" in § 1362(6). But, to the Court, that did not clearly indicate that Congress intended the Clean Water Act to displace the Atomic Energy Commission's authority to regulate certain effluents discharged from nuclear power plants. *Id.* at 23–25. Similarly, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Court acknowledged that certain isolated wetlands arguably fell within the literal meaning of "waters of the United States"—the term that § 1362(7) used to define "navigable waters," the Clean Water Act's jurisdictional hook. *Id.* at 172–73. But that literalism, the Court instructed, was not a clear authorization for the agency to regulate those wetlands. *Id.*

This approach is not unique to the Clean Water Act, either. In *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), the Court discarded the idea that Congress had clearly authorized the EPA to regulate greenhouse gases under a specific provision of the Clean Air Act just because they fell within a literal interpretation of the Act's definition of "air

16

pollutant."[12]  *Id.* at 315–16, 319–21.  Similarly, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), the Court denied the FDA authority to regulate tobacco products under the Food, Drug, and Cosmetic Act even though those products fell within that statute's expansive definitions of "drug," "device," and "combination products."[13]  *Id.* at 125–26.  Those broad definitions were too "cryptic" to qualify as clear congressional authorization.  *Id.* at 160.

Each of these cases demonstrates that an expansive, vaguely worded definition is not akin to clear congressional authorization.  So, in a major-questions case, more is required before holding that the agency has been granted the asserted power.  Yet Fisheries cannot point to anything else.  The sole basis for its reading is the Act's use of "biological materials" and "discharge."  But, under the major-questions doctrine, it does not follow that the Clean Water Act *clearly* regulates returning bycatch to the ocean simply because bycatch falls within the literal definition of "biological materials" and returning it might be

---

[12] The Clean Air Act defines "air pollutant" as "any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive . . . substance or matter which is emitted into or otherwise enters the ambient air."  42 U.S.C. § 7602(g).

[13] The Food, Drug, and Cosmetic Act defines "drug" to include "articles (other than food) intended to affect the structure or any function of the body."  21 U.S.C. § 321(g)(1)(C).  It defines "device" to include "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article . . . intended to affect the structure or any function of the body."  § 321(h)(1)(C).  "Combination products" are "products that constitute a combination of a drug, device, or biological product."  21 U.S.C. § 353(g)(1).

17

understood as a "discharge."[14] *Cf. Util. Air*, 573 U.S. at 319 (explaining that a "sweeping" act-wide definition "is not a command to regulate").

The simple truth is that, although there is a "plausible textual basis" for Fisheries' reading, § 1362(6)'s statement that "pollutant means . . . biological materials" and § 1362(12)'s statement that "discharge . . . means addition" fall short of the clear congressional authorization needed when the major-questions doctrine applies. *See West Virginia*, 142 S. Ct. at 2609. So we must reject Fisheries' proposed interpretation and hold that § 1311 of the Clean Water Act does not regulate returning bycatch to state waters. The district court thus properly dismissed Fisheries' bycatch claim.

## B.   Fisheries' sediment claim fails

Fisheries also alleges that the shrimp trawlers are violating § 1311(a) of the Act by employing trawl nets in the Pamlico Sound without a permit. According to Fisheries, these nets disturb the Sound's floor, causing sediment to temporarily suspend in the water. Disturbing this sediment, Fisheries says, amounts to the unpermitted discharge of a

---

[14] Discharge is defined as an "addition," *see* § 1362(12), but that does not clearly encompass throwing bycatch overboard. "Addition" means "a thing or part added; increase." *Addition*, Webster's New World Dictionary (3d College ed. 1988). But bycatch adds nothing to the water that was not already there. When shrimp trawlers haul their nets out of the water, the nets are (ideally) full of shrimp and other fish (bycatch). The trawlers keep the shrimp, and throw the bycatch overboard, returning it to the water. So there is no "increase" of anything. As the Second Circuit colorfully put it, "[i]f one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot (beyond, perhaps, a *de minimis* quantity of airborne dust that fell into the ladle)." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 492 (2d Cir. 2001). Extending that analogy here, Fisheries asks us to believe that taking a ladle of soup from a pot, lifting it above the pot, removing some vegetables, and pouring the ladle back into the pot is an addition. That unintuitive understanding of discharge cannot provide clear congressional authorization.

18

pollutant. To prevail, Fisheries must leap at least three hurdles: (1) the disturbed sediment must be a pollutant; (2) that pollutant must be added to the water; and (3) that addition must come from a point source. *See* §§ 1311, 1362(11); *U.S. Pub. Rsch. Grp.*, 215 F. Supp. 2d at 246.

Fisheries has two theories of victory. Its first theory is that the sediment that the trawl nets disturb is "dredged spoil," and thus a "pollutant." If that is right, and if the shrimpers add that "dredged spoil" to the water from a point source, then they would need a § 1344 permit from the U.S. Army Corps of Engineers to lawfully use their nets.

Fisheries' second theory is that, even if the disturbed sediment is not dredged spoil, it at least consists of rock and sand, which separately qualify as pollutants. If so—and again if that rock and sand is added to the water from a point source—then the trawlers would need a § 1342 permit from the EPA to lawfully use their nets.[15]

Fisheries' first theory fails at the first hurdle: it has not identified a *pollutant*. True, the Clean Water Act's definition of "pollutant" includes "dredged spoil." § 1362(6). But the trawlers' stirred-up sediment cannot be understood as dredged spoil. While the Act does not define "dredged spoil," plain language makes at least one thing clear: it must be dredged. The verb dredge means "[t]o clear out with a dredge; remove sand, silt, mud, etc., from the bottom of." *See Dredge*, American College Dictionary (1970). It generally refers

---

[15] Fisheries wins if it succeeds on either theory. But the two theories are mutually exclusive since an activity cannot require both types of permits. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 274 (2009) ("[I]f the Corps has authority to issue a permit for a discharge under [§ 1344], then the EPA lacks the authority to do so under [§ 1342].").

to an act meant "to enlarge or clean out (a river channel, harbor, etc.)." *Dredge*, Webster's New World Dictionary (2d coll. ed. 1968). In other words, dredged spoil is the accumulated result of some excavation or land-altering activity. *See* 33 C.F.R. § 323.2(c) (defining dredged material as "material that is excavated or dredged from waters of the United States."). It is not the temporary, incidental disturbance caused by a shrimp net.[16]

This reading of "dredged spoil" also reflects the structure of the Clean Water Act. The Act sends most would-be dischargers of pollutants to the EPA to obtain a permit. *See* § 1342. But, for would-be dischargers of dredged spoil and other dredged material, the Act has a different plan. Would-be dredgers must go to the Army Corps of Engineers for their permit. *See* § 1344. The Corps specializes in—as one might expect—engineering. It oversees construction and land-alteration projects. This specialization sets it apart from the EPA. And the fact that this type of pollutant is singled out for Corps jurisdiction suggests that dredged spoil, as the term is used in the Clean Water Act, is the product of excavation and similar land-altering activities.

---

[16] Even if it were, Fisheries' claim might still fail. Take the second hurdle: Fisheries must show that the trawlers "discharged"—that is, *added*—a pollutant. Fisheries argues that, by stirring up sediment, the trawlers are *transforming* the ocean floor into "dredged spoil," and that this transformation constitutes the "addition" of a pollutant even if no new material is added to the water. But we need not decide whether this kind of "transformation" amounts to an "addition," and thus a "discharge."

Consider also the third hurdle: the alleged addition must come from a "point source." A point source is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." § 1362(14). While the boat itself constitutes a point source, the net is the cause of the alleged discharge here. And it is unclear how the net constitutes a point source. *See id.* But we need not decide either question today.

20

So too does the fact that the only other type of discharge handled by the Corps is the discharge of "fill material." Discharges of fill material usually occur during construction projects. *See* 40 C.F.R. § 232.2. As this demonstrates, the Corps has jurisdiction over activities that alter the water's floor through excavation (discharge of dredged materials) and construction (discharge of fill materials). If you are not performing one of those activities, you are not dredging or filling. So the shrimpers are not dredging—and thus cannot be creating dredged spoil—simply because their nets temporarily kick up sediment as they trawl for the day's catch. And that means that they do not need to obtain a permit from the Corps.

Fisheries second theory—that trawling discharges rock and sand—fails at the second hurdle: no pollutant is *added*. The Clean Water Act expressly identifies both rock and sand as pollutants. § 1362(6). Yet, even if the disturbed sediment is a "pollutant," the shrimpers did not "discharge" it. Discharging a pollutant requires its "addition" to navigable waters. § 1362(12). But, if a pollutant is already present in the body of water, moving that pollutant around inside that same body of water is not discharging it—nothing is added. *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 82–83 (2013). So the shrimpers do not need a Clean Water Act permit to stir up already-present rock and sand with their nets.

*                *                *

"[I]n certain extraordinary circumstances, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there" absent "clear congressional

21

authorization" for the power claimed. *West Virginia*, 142 S. Ct. at 2609 (quoting *Util. Air*, 573 U.S. at 324). This is such a circumstance. Though the Clean Water Act's includes the term "biological materials" in its definition of "pollutant," that is not clear authorization for the EPA to regulate bycatch under the Act. So Fisheries Reform Group's first claim—that shrimpers are violating the Clean Water Act by discarding bycatch overboard without a § 1342 permit—was properly dismissed.

Fisheries' second claim—that shrimpers are violating the Act by using trawl nets without a permit—fares no better. The shrimpers are not "dredging" the Pamlico Sound with their nets, so they cannot be discharging "dredged spoil." And the dirt and sand that their nets kick up is not "added"—and thus not "discharged"—into the Sound.

Because Fisheries has not plausibly stated a claim for relief, the decision of the district court is thus

*AFFIRMED.*